GERMAN ALLIANCE INS. CO. v. BARNES, Superintendent of Insurance of Kansas.

(Circuit Court, D. Kansas, First Division. June 17, 1911.

No. 8,868.

1. CONSTITUTIONAL LAW (§ 276*)—PROPERTY RIGHTS—LIBERTY TO CONTRACT—"TAKING OF PRIVATE PROPERTY."

The taking away by legislative enactment of the free exercise of the right of private contract is an appropriation by the state of private property within the meaning of the fourteenth constitutional amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 845, 846; Dec. Dig. § 276.*

For other definitions, see Words and Phrases, vol. 8, pp. 6851–6862; 7813.]

2. CONSTITUTIONAL LAW (§ 298*)—INSURANCE (§ 4*)—POLICE POWERS OF STATE—REGULATING FIRE INSURANCE CHARGES—KANSAS STATUTE.

Laws Kan. 1909, c. 152, providing for the regulation of rates and charges by fire insurance companies doing business in the state, is not in violation of any rights secured to such companies by the fourteenth constitutional amendment, but is within the legitimate powers of the state and valid.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298;* Insurance, Dec. Dig. § 4.*]

In Equity. Suit by the German Alliance Insurance Company against Charles W. Barnes, as Superintendent of Insurance of the State of Kansas. On demurrer to bill. Demurrer sustained.

Thomas Bates, Z. T. Hazen, and Seymour Edgerton, for complainant.

Fred S. Jackson and Charles Blood Smith, for defendant.

POLLOCK, District Judge. This suit was instituted by complainant, an insurance corporation of the state of New York, engaged in transacting the business of fire insurance within the state by its permission and authority, to procure a decree perpetually enjoining and restraining defendant, as Superintendent of Insurance, from proceeding further under or in the enforcement of an act of the Legislature of the state entitled, "An act relating to fire insurance and to provide for the regulation and control of rates of premium thereon, and to prevent discrimination therein, "being chapter 152, Sess. Laws 1909, which said act took effect May 29, 1909, by which the Legislature assumed to regulate and limit the rates which should be charged for policies of fire insurance in all cases except where the policy is issued by a farmers' mutual insurance company, organized and doing business under the laws of this state, and insuring only farm property.

The question intended to be presented by the bill for decision is the constitutional validity of the act. Defendant has demurred to so much of the bill of complaint as challenges the validity of the act. The act reads as follows:

"Section 1. That every fire insurance company shall file with the Superintendent of Insurance general basis schedules showing the rates on all classes

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of risks insurable by such fire insurance company in this state, and all charges, credits, terms, privileges and conditions which in any wise affect such aforesaid rates or the value of the insurance issued to assured.

"Sec. 2. No change shall be made in the schedules which have been filed in compliance with the requirements of this act, except after ten days' notice to the Superintendent of Insurance, which notice shall plainly state the changes proposed to be made in the schedules then in force and the time when such changes will go into effect; and such changes shall be shown by filing new schedules, or shall be plainly indicated on the schedules in force at the time; provided, that the Superintendent of Insurance may, in his discretion and for good cause shown, allow changes upon less than the notice specified herein, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions.

"Sec. 3. When the Superintendent of Insurance shall determine that any rate made by an insurance company in this state is excessive or unreasonably high, or that said rate is not adequate to the safety or soundness of the company granting the same, he is authorized to direct said company to publish and file a higher or a lower rate, which shall be commensurate with the character of the risk, but in every case the rate shall be reasonable.

"Sec. 4. That no fire insurance company shall engage or participate in the insurance of any property located in this state unless the schedules of rates under which such property is insured has been filed in accordance with the provisions of this act; nor shall any fire insurance company write any insurance at a rate different than the rate named in its schedules, or refund or remit in any manner or by any device any portion of the rates so established, or extend to any insured or other person any privileges, advantage, favor, inducement or concession, except as is specified in such schedule.

"Sec. 5. Any fire insurance company entering into any contract of insurance on property located within this state for which no rate has been filed by such company as provided in section 1 of this act, shall within thirty days after entering into such contract, file with the Superintendent of Insurance in such form as may be required by him, a schedule of such property showing the rate thereon, and such information as may be required by such Superintendent of Insurance. Such schedule shall conform to the general basis schedule as provided in section 1, of this act, and when filed shall constitute the premium rate of such company for the described property.

"Sec. 6. That all schedules and local tariffs filed in accordance with the provisions of this act shall be open to the inspection of the public, and each local agent shall have and exhibit to the public copies thereof relative to all risks upon which he is authorized to write insurance.

"Sec. 7. That no fire insurance company shall directly or indirectly by any special rate, tariff, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less or different compensation for the insurance of any property located in this state than it charges, demands, collects or receives from any other person or persons for like insurance or risks of a like kind and hazard under similar circumstances and conditions in this state; and any fire insurance company violating any of the provisions of this section shall be deemed guilty of unjust discrimination, which is hereby declared to be unlawful.

"Sec. 8. That the Superintendent of Insurance, if he shall find that any insurance company or any officer, agent or representative thereof, has violated any provisions of this act, may in his discretion, revoke the license of such offending company, officer or agent; but the revocation of any license as provided in this section shall in no manner affect the liability of such company, officer, agent or representative to the infliction of any other penalty hereinafter provided by any other section for violation of this act; and, provided, that any action, decision or determination of the Superintendent of Insurance under the provisions of this act shall be subject to review by the courts of this state as herein provided.

"Sec. 9. The Superintendent of Insurance shall not make any regulation or order without giving the insurance company concerned reasonable notice thereof, and an opportunity to appear and be heard in respect to the same,

and if any insurance company or any other person, city or municipality which shall be interested in said order shall be dissatisfied with any regulation, order or rate adopted by said superintendent of insurance, said party or parties shall have the right within thirty days after the making of said regulation or order to bring an action against said superintendent of insurance in any district court of the state of Kansas to have such regulation or order vacated, and shall set forth in the petition the particular regulation or order complained of and the particular cause or causes of objection to any or all of them, and a summons shall be served upon the Superintendent of Insurance by delivering a copy thereof to his office at the state capitol, and such service may be had by the clerk delivering a certified copy of said summons by mail to the said superintendent of insurance at his office. Issues shall be formed and the controversy tried and determined as in other cases of a civil nature; and the court may set aside, vacate or annul one or more or any part of any of the regulations or orders adopted or fixed by the said superintendent of insurance which shall be by said court found to be unreasonable, unjust, excessive or inadequate to compensate the company writing insurance thereon for the risk assumed by it, without disturbing others. No injunction, interlocutory order or decree suspending or restraining the enforcement of an order of the Superintendent of Insurance shall be granted, provided; that the court may permit any company complaining under this act to write insurance at any rates which obtained prior to the ordering of the rate complained of, by the Superintendent of Insurance, upon condition that the difference between the rate complained of by the company and the rate at which it seeks to write insurance may be deposited with the superintendent of insurance, and on the final determination of the suit shall be paid by him to the insurance company, if the court shall find it entitled to the same, or to the holders of policies written by said company after the rate complained of was ordered by the Superintendent of Insurance, as the court may deem just and equitable. Whenever any action shall be brought by any insurance company under the provisions of this section within said period of thirty days, no penalties or forfeitures shall attach or accrue on account of the failure of the plaintiff to comply with the order sought to be vacated or modified in said action until the final determination of said suit. Either party to said cause, if dissatisfied with the judgment or decree of said court, may institute proceedings in error in the Supreme Court as in other civil cases, and said court shall examine the record, including the evidence, and render such judgment as shall be just and equitable, in the premises. No action shall be brought in any of the courts of the United States to set aside any order made by the Superintendent of Insurance under the provisions of this act before all of the remedies provided for herein shall have been exhausted by the party complaining. And if any company organized under the laws of this state, or authorized to transact the business of insurance in this state by the Superintendent of Insurance, shall violate this section, the Superintendent of Insurance may cancel the authority of said insurance company to transact business in this state.

"Sec. 10. That any fire insurance company, or any director or officer thereof, or any agent or person acting for or employed by such company, who alone, or with any other corporation, company or person, shall willfully do or cause to be done, or shall willfully suffer or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or who shall willfully omit or fail to do any act, matter or thing so directed by this act to be done, not to be done, or shall be guilty of any infraction of this act, shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be punished by a fine not to exceed one hundred dollars for each offense; provided, that if the offense for which any person shall be convicted, as aforesaid, shall be an unlawful discrimination, such persons shall be punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail for a term not exceeding ninety days, or by both such fine and imprisonment.

"Sec. 11. No person shall be excused from giving testimony, or producing evidence, when legally called upon so to do at the trial of any other person charged with violation of any of the provisions of this act, on the ground that

it may tend to incriminate him under the laws of this state; but no person shall be prosecuted or subject to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may so testify or produce evidence under the authority of this act, except for perjury committed in so testifying; provided, that nothing in this act shall affect farmers' mutual insurance companies organized and doing business under the laws of this state and insuring only farm property.

"Sec. 12. This act shall take effect and be in force from and after its publication in the statute book."

While the bill of complaint charges the act to be repugnant to the several provisions of the fourteenth amendment to the national Constitution, and section 1 of article 3 of the Constitution of the state as well, at the oral argument, and in the elaborate and exhaustive brief and argument filed for complainant, but one position is taken and urged with that vigor and reliance which characterizes the presentation to a court of justice of a matter of large importance by earnest, able and diligent solicitors, thoroughly convinced of the justice and right of their client's cause.

The position thus sought to be maintained by solicitors for complainant in their endeavor to establish the invalidity of the act challenged because in violation of the provisions of the fourteenth amendment to the national Constitution may be briefly presented by a statement of the following propositions on which complainant relies:

(1) The statute is one providing for the regulation of rates and charges which may be contracted for and received by complainant in this state in the transaction of the business for which it was created and which by the state it is authorized to transact.

(2) The act of the state in regulating rates to be paid and charges for the performance of a service or in the transaction of a business authorized to be transacted is the taking of private property.

(3) The power exercised by a state in the regulation of rates and charges to be paid for the performance of a service or the transaction of a business is the power of eminent domain; that is, the power to take private property for a public use only.

(4) A contract of fire insurance is a purely private contract of indemnity against loss by fire, and the business of writing such insurance policies or contracts of indemnity for the protection of the property of the citizen against the contingency of loss by fire is a purely private business, disassociated from, and not affected with, any public use.

(5) Ergo, as a contract of fire insurance written between complainant and a citizen of the state is a purely private contract of indemnity of the citizen against loss by fire, and as the fire insurance business of complainant transacted by it within the state, under authority from the state, is a purely private business, wholly disassociated from and not affected in any manner with a public use, it is beyond the constitutional power of the state to regulate the rates charged by it because such attempted regulation constitutes a taking of its private property for the use and benefit of the private citizens of the state; hence, the attempt of the state to so do by the act in question is in violation of the provisions of the fourteenth amendment to the national Constitution, and void.

(6) That the exercise by the state of the power of taking private property for a private use attempted to be employed in the passage of the act in question cannot be justified either under the police power of the state,

(7) Or, under its power of admitting foreign corporations within its borders to engage in business on such terms as it may prescribe, or in pursuance of any other power possessed by the state.

From the foregoing statement of fundamental propositions on which complainant bottoms its charge of invalidity against the act, it is seen to be freely conceded by complainant when in any given case the business transacted or the service performed is in its nature public, quasi public, or affected with a public use in which the public have an interest, or in any case where a member of the public may of right demand on any terms the performance of the service, or the transaction of the business, in such cases the lawmaking power of the state may for the purpose of securing to the public reasonable rates and charges for the service performed or business transacted, and for the purpose of protecting the public from extortion, oppression, or unreasonable rates or charges, make such reasonable regulations of rates and charges to be paid therefor as the lawmaking power may deem wise and prudent. On the contrary, however, it is most earnestly insisted by complainant the business in which it is engaged within the state, under authority of the state, is neither in its inherent nature public, quasi public, nor affected with any public use whatever, but that the business in which it is engaged is in its very nature purely and strictly private between itself and the members of the public with which it deems proper to deal by private contract, in the same manner and to like extent as is the business of the merchant, the grocer, or the butcher in dealing with his patrons; that the personal element does and of necessity must enter into the transaction of such business; that the property of one man of known standing for his care, diligence, probity, and honesty may be a good risk, whereas, like property similarly situated, owned by the weak, the slothful, or the vicious is a hazardous risk, and, as the rate charged is based absolutely and alone on the risk assumed from sheer force of necessity and out of a just regard for fairness and honesty in dealing, the greater risk must pay the greater rate; that the act of the state in stepping between the parties in their negotiations over purely private business affairs, and its attempt to regulate their personal contracts, in such manner as to require complainant to indemnify against the risk by fire, the scoundrel who would willingly, if he believed he could escape detection and punishment for his crime, put the brand to his property, on the same terms and conditions as to the compensation to be paid for assuming the risk as is charged the upright and just man, when from the inherent differences between the men themselves who own the properties, and not a difference in the properties insured, the hazard in the one case is greater than in the other, is not alone an unwarranted intermeddling and invasion on the part of the state with the right of private contract possessed by the citizen under the Constitution, but is also positively paternalistic and vicious.

The elaborate and exhaustive brief, argument, and review of authorities filed and relied upon by complainant in support of the contention made in this behalf cannot but impress the thinking mind with the gravity of the situation and the ultimate consequences which in the natural order of sequence must follow in the wake of such legislation if it be upheld as valid and be extended to all subject-matters to which it may and undoubtedly will in future be made applicable. However, the question presented to the court to determine in this case does not concern itself, on the one hand, with the wisdom or policy of the act, or, on the other, with that state of affairs which will or must inevitably follow in the course of such legislation. The court must consider alone and only whether beyond all reasonable doubt the act challenged lies clearly without the legitimate exercise of that wide range of constitutional power which the people of the state, with the consent of the nation, have conferred on the lawmaking power of the state, as the lawful exercise of that power has been defined, delimited, and declared by those courts whose decisions are controlling here. And in this regard it may be observed the obligation does not rest with those who seek to uphold and maintain the validity of the exercise of power by the state here challenged to point out wherein or whereby the state lays claim to the right to lawfully exercise the power displayed, but it does devolve upon those who deny the exercise of such power to the state to point out with clearness and certainty the precise provision of the national Constitution which in express terms or by necessary implication, says this thing may not be done, for upon the Legislature of this state, by the organic law of the state, is conferred all the legislative power possessed by the people in their collective capacity except such as was by the national Constitution conferred on the Congress, or is by the state Constitution expressly reserved to the people by prohibitive provisions contained in that instrument.

The very broad and comprehensive language of that provision of the state Constitution conferring legislative power reads as follows:

"The legislative power of this state shall be vested in a House of Representatives and Senate." Section 1, art. 2, State Const.

Wherein, then, does complainant with that clearness and precision demanded by the occasion point out beyond peradventure or doubt the act challenged to be in violation of the national Constitution, and thus beyond the power of the state?

It is conceded the act in question does make provision for the regulation of rates and charges in the transaction of the business of fire insurance; that the exercise of the power of fixing or regulating rates is the exercise of legislative power; that the business of fire insurance is a private business, and a contract of insurance has been declared to be a purely private contract of indemnity; that no one has the right to demand of or to compel an insurance company to contract with him either on such terms as may be agreed between the parties, or such terms as may be prescribed by the lawmaking power of the state; that, generally speaking, it is true the only power of the state to compel a member of the body public to part with his private property is in aid of the administration of the affairs of the state or government

under some form of taxation, a power essential to the continued existence and perpetuity of the state, where the compensation made in return for that taken lies in the protection afforded the donor, or by the exercise of that other sovereign power of eminent domain by which a member of the public is compelled to part with his private property for a public use on just compensation being made him in return, a power, the exercise of which is indispensable to the accomplishment of the purposes of government, or where, in the lawful exercise of the police power of the state, private property is seized and confiscated as contraband goods, a power, the exercise of which is essential to the preservation of order and the enforcement of the laws. Again, it may have been at one time thought by the courts of this country the state could only take the private property of its citizens or those members of the great body politic present in or having property within the state by the exercise of the one or the other of the powers above enumerated.

[1] It may also be conceded the exercise of the legislative power of fixing or regulating rates and charges for services performed or engagements undertaken is an appropriation by the state of private property; for it is a taking away from the contracting parties of their right of private contract which is private property. Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937; Mathews v. People, 202 Ill. 389. 67 N. E. 28, 63 L. R. A. 73, 95 Am. St. Rep. 241; State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443; Harbison v. Knoxville Iron Works, 103 Tenn. 421, 53 S. W. 955, 56 L. R. A. 316, 76 Am. St. Rep. 682.

It may be further conceded heretofore the exercise of the right to fix or regulate rates and charges has been almost, if not altogether, confined to those engaged in the transaction of a public business or the transaction of a business affected with a public use. And it may be further conceded, as contended by complainant, it were better in the preservation of the liberties and rights of the individual citizen, both natural and corporate, and would the better tend toward the preservation and perpetuation of the state itself, if the line of demarcation in the power of the state to interfere in the regulation of the affairs of its citizens, or those transacting business within its borders were absolutely fixed and established by sound and settled judicial decisions so plain, clear, and cogent that no one might err therein as to his individual rights, that no Legislatures might dare overstep such rights, and that no court might be found in which such rights would not be known, recognized, and enforced. But has this been done?

[2] In the light and trend of recent judicial decisions controlling here, can it be said the state must be denied the right to regulate the rates and charges of either foreign insurance companies transacting business within her borders, as is complainant, or domestic insurance corporations of her own creation, in the exercise of her reserved powers, having in view the great magnitude of the business transacted by such companies, its intimate relation to the commercial business world, and the direct influence the business so transacted has on the prosperity of the individual citizen affected thereby? Although it may be con-

ceded never before to have been done, and that no authority expressly authorizing such interference may be found, and although it may have been heretofore thought the foundation stones underlying the right of the state to enact such regulation has been in principle rejected by the more remote adjudications.

In the determination of this question it will be both a useless and unnecessary labor to attempt a review and discussion of the many authorities on the briefs of solicitors for the respective parties. A reference to a few only of the more recent cases will be attempted. The case of Noble State Bank v. Haskell et al., 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, decided January 3d of this year, was a case in which the Legislature of the state of Oklahoma undertook to compel all banking institutions of that state to contribute to a fund to be employed by the state in the liquidation of the debts of any such institution of the state as might become insolvent and unable to pay its depositors. This legislation was challenged as beyond the constitutional power of the state on the seemingly sound ground that in its operation it took the private property of the stockholders of one institution to pay the private obligations of another without the consent and over the protest of the owners. It will be observed there was involved in that case no question of the state's power of taxation. No question of the exercise by the state of the power of eminent domain, no question of the exercise of its police power to take, hold, or confiscate contraband property, and apparently no question of the exercise of any other power of the state heretofore exercised under settled and well established authority, yet the contention of complainant that the act in its operation took its private property for a private use was met by Mr. Justice Holmes, delivering the opinion of the court, in the following language:

"The substance of the plaintiff's argument is that the assessment takes private property for private use without compensation. And, while we should assume that the plaintiff would retain a reversionary interest in its contribution to the fund, so as to be entitled to a return of what remained of it if the purpose were given up (see Receiver of Danby Bank v. State Treasurer, 39 Vt. 92, 98), still there is no denying that by this law a portion of its property might be taken without return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place, it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what in its immediate purpose is a private use. Clark v. Nash, 198 U. S. 361 [25 Sup. Ct. 676, 49 L. Ed. 1085]; Strickley v. Highland Boy Mining Co., 200 U. S. 527, 531 [26 Sup. Ct. 301, 50 L. Ed. 581]; Offield v. New York, N. H. & H. R. Co., 203 U. S. 372 [27 Sup. Ct. 72, 51 L. Ed. 231]; Bacon v. Walker, 204 U. S. 311, 315 [27 Sup. Ct. 289, 51 L. Ed. 499]. And in the next it would seem that there may be other cases beside the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume."

Again, in defining the police power of the state, and in pointing out the wide extent of its operations, and the infinite variety of objects which by the state may be accomplished thereunder, it is said:

"It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U. S. 518 [17 Sup. Ct.

864, 42 L. Ed. 260]. It may be put forth in aid of what is sanctioned by usage or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

It is self-evident the decision of the question as to what constitutes "great public needs" or what shall be held by "prevailing morality or strong and preponderant opinion" to be "greatly and immediately necessary to the public welfare" must be left to the lawmaking power of the state, for of such matters courts know nothing, and have no means of discovery. It is equally obvious the range of a power so defined in its operations must be as boundless as the mental desires, imaginations, and visions of men.

Again, in speaking of the power of control of the state over the business of banking, which in its nature is a private business, as much as is fire insurance, at least in so far as it relates to mere banks of discount and deposit, it is said:

"We cannot say that the public interests to which we have adverted and others are not sufficient to warrant the state in taking the whole business of banking under its control. On the contrary, we are of opinion that it may go on from regulation to prohibition except upon such conditions as it may prescribe. In short, when the Oklahoma Legislature declares by implication that free banking is a public danger, and that incorporation, inspection, and the above-described co-operation are necessary safeguards, this court certainly cannot say that it is wrong."

Surely, then, if the police power or any power possessed by a state may go to the extent of a compulsory taking of the private property of one banking institution to meet the private obligations of another in the furtherance of a supposedly ultimate benefit to the public, why by the same token and to a like end may the Legislature of a state not provide for the regulation of the rates and charges of fire insurance companies transacting business within its borders and with its citizens, although it be conceded the business of fire insurance is a private business, and the regulation thus imposed does constitute the taking of the private property of the insurance company by destroying the free exercise of the right of private contract, it cannot be thought the intangible property of the insurance company so taken without compensation is more sacred or less inviolate than the tangible property of the bank appropriated by the same means and to the same end. Not only so, but under the doctrine therein declared the state may take under its control the whole subject of fire insurance and conduct its operations in such manner by such agencies and on such terms and conditions as to form of contract, compensation to be paid for the indemnity from risks secured by its citizens, as the lawmaking power may in its wisdom prescribe. Again, the power of the state over the transaction of corporate insurance companies, foreign or domestic, the business of which is not within the power of Congress to regulate under the commerce clause of the national Constitution, must be conceded to be as plenary as is the power of Congress over interstate commerce under the commerce clause (if we lay aside from consideration, for the moment, the public nature of such interstate commerce. In Atlantic Coast Line Co. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, Mr. Justice Lurton, speak-

ing of the power of Congress to make the initial carrier liable for damages for loss or injury to goods in the hands of a connecting carrier, said:

"It is obvious from the many decisions of this court that there is no such thing as absolute freedom of contract. Contracts which contravene public policy cannot be lawfully made at all, and the power to make contracts may in all cases be regulated as to form, evidence, and validity as to third persons. The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests."

Again, it is not entirely clear at this late day, as contended by complainant, the business of fire insurance although in its nature a private business will in future continue to be regarded as entirely unaffected with a public use. Mr. Justice Harlan, delivering the opinion of the court in the recent case of Complainant v. Hale, 219 U. S. 307, 31 Sup. Ct. 246, 55 L. Ed. 229, wherein the constitutional validity of an act of the state of Alabama, which provided for the recovery by the assured from the company of 25 per cent. more than the actual loss sustained on the mere showing the company writing the contract belonged to an insurance tariff or rate association, said:

"We concur entirely in the opinion expressed by the state court that the statute does not infringe the federal Constitution, nor deprive the insurance company of any right granted or secured by that instrument. The business of fire insurance is, as every one knows, of an extensive and peculiar character, and its management concerns a very large number of people, particularly those who own property and desire to protect themselves by insurance. We can well understand that fire insurance companies, acting together, may have owners of property practically at their mercy in the matter of rates, and may have it in their power to deprive the public generally of the advantages flowing from competition between rival organizations engaged in the business of fire insurance. In order to meet the evils of such combinations or associations, the state is competent to adopt appropriate regulations that will tend to substitute competition in the place of combination or monopoly. Carroll v. Greenwich Ins. Co., 199 U. S. 401, 411 [26 Sup. Ct. 66, 50 L. Ed. 246]. Regulations, having a real, substantial relation to that end, and which are not essentially arbitrary, cannot properly be characterized as a deprivation of property without due process of law. They are enacted under the power with which the states have never parted, of caring for the common good within the limits of constitutional authority. Insurance companies, indeed, all corporations, associations, and individuals, within the jurisdiction of the state, are subject to such regulations, in respect to their relative rights and duties, as the state may, in the exercise of its police power and in harmony with its own and the federal Constitution, prescribe for the public convenience and the general good. Jacobson v. Massachusetts, 197 U. S. 11, 27, 31 [25 Sup. Ct. 358, 49 L. Ed. 643]; Lake Shore, etc., v. Ohio, 173 U. S. 285, 297 [19 Sup. Ct. 465. 43 L. Ed. 702]; House v. Mayes, 219 U. S. 270 [31 Sup. Ct. 234, 55 L. Ed. 213]."

True, in that case, the act was upheld on the ground it was the intent of the Legislature in its enactment to prevent (by punishment of forfeiture to the assured) the combination of insurance companies to stifle competition on the theory that competition in business is an ultimate good, whereas the evident theory and intent of the Legislature in the enactment of the act here in controversy, as shown by its text and title, was that competition between insurance companies for business except mutual insurance companies of the state doing a farm busi-

ness is bad in its tendency and should therefore be cut off and destroyed, to the end that all dealing with them may receive like and equal treatment without discrimination. However, the principle involved and underlying the exercise of legislative power is the same in the one case as it is in the other. It is the exercise of the power to regulate the amount received by the complainant from the assured for entering into the contract of indemnity which is involved in this case, and in that it was the exercise of the power to regulate the amount to be paid to the assured in case of loss sustained, regardless of the terms of the contract. The one act is designed to promote, the other to destroy, competition, but that is a question of state policy, not of law.

Without attempting a further discussion of the propositions relied on by complainant in its elaborate brief and argument, or a reference to the many authorities therein cited and elaborated upon in argument, it will suffice to say in the light of recent decisions, which must control here, I am of the opinion the act challenged does not violate any right secured to complainant by the provisions of the fourteenth amendment to the federal Constitution, and that the act will be upheld as within the legitimate exercise of the lawmaking power of the state.

The demurrer, therefore, to so much of the bill of complaint as challenges the validity of the act will be sustained.

It is so ordered.