# Wytheville

AETNA INSURANCE COMPANY, ET ALS. V. COMMONWEALTH
OF VIRGINIA, AT THE RELATION OF THE STATE
CORPORATION COMMISSION.

June 15, 1933.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning
and Chinn, JJ.

The opinion states the case.

*Leake & Buford* and *E. Randolph Williams,* for the appellants.

*John R. Saunders, Attorney-General, Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General, S. L. Kelly, John N. Sebrell, Wilbur C. Hall, R. Gray Williams, J. R. Tucker* and *Armistead M. Dobie,* for the appellee.

GREGORY, J., delivered the opinion of the court.

The General Assembly of Virginia, in 1928, placed under the regulation and supervision of the State Corporation Commission, the rates, premium charges, rating methods, rules and regulations of insurance companies providing insurance against loss or damage by fire, windstorm, tornado, hail, lightning, automobile fire and theft, and all other kinds of insurance which fire insurance companies are authorized to write in this State, with certain exceptions that appear in the act. The statute making provision for such regulation is found in the Acts of 1928, chapter 433, page 1115, and it became effective on June 18, 1928.

The act required the insurance companies to become members of a rating bureau known as the Virginia Insurance Rating Bureau and to file one uniform schedule of rates with the State Corporation Commission through said bureau.

Sections 8 and 9 of the act are the sections that are to be chiefly considered and they read as follows:

"8. No rate, premium charge, schedule, rating method, rule, by-law, agreement or regulation shall become effective or shall be charged, applied or enforced in this State by such rating bureau, insurance company, or other insurer, governed by the provision of this act until it shall have been first filed with and approved by the State Corporation Commission, but a rate produced by an approved schedule shall be used pending such approval.

"9. The State Corporation Commission is hereby empowered to investigate, either upon its own motion, or at the request of any citizen of this State, the necessity for a reduction of rates. If, upon such investigation, it appears that the rates charged in this State for the five years next

preceding are producing a profit in excess of what is reasonable, it shall order such reduction of rates as will, in its opinion, produce a fair and reasonable profit only. Any such reduction ordered by the State Corporation Commission shall be applied by the companies, subject to its approval. If the companies do not, within thirty days, submit a classification, or classifications, which meet the approval of the State Corporation Commission, it shall apply such reduction in such manner as appears to it to be just and equitable. In determining the question of profits, rates and premium charges, the Corporation Commission is authorized and empowered, in its discretion, to consider all branches and phases of the business, both within and without the State, and to use its own judgment and discretion in arriving at profits, rates and premium charges that are reasonable.

"The State Corporation Commission is also empowered, after investigation, to order removed at such time and in such manner as it shall specify any discrimination existing between individual risks, classes of risks, or territorial classifications."

The Virginia Insurance Rating Bureau filed, on June 18, 1928, with the State Corporation Commission, its rates and premium charges which its members, the fire insurance companies, proposed to apply in Virginia on and after June 18, 1929, and asked approval thereof by the Commission.

On the same day the Commission entered its order suspending the application of the rates filed. On June 23, 1928, it entered an order instituting the investigation of rates here under review. That order reads as follows:

"It is ordered by the State Corporation Commission of Virginia:

"I. That an investigation and inquiry be and hereby is instituted into the following matters:

"1. Into the fairness and reasonableness of every and all rates, premium charges, schedules, rating methods, rules, by-laws, agreements, and regulations applicable to or relat-

ing to insurance against loss or damage by fire and/or lightning which were on June 16, 1928, and are now under temporary permit pending further order of this Commission, being charged, applied, and/or enforced in Virginia by any and all insurance companies governed by the provisions of chapter 433, Acts 1928, and of every and all rates, premium charges, schedules, rating methods, rules, by-laws, agreements and regulations applicable to or relating to insurance against loss or damage by fire and/or lightning which any such company has on or after June 18, 1928, filed with the State Corporation Commission, or shall file during the pending of this investigation with this Commission for application in Virginia:

"2. Into the propriety and necessity of reducing any one or more, or all, such rates and premium charges:

"3. Into whether or not such rates, premium charges, schedules, rating methods, rules, by-laws, agreements, and/or regulations, or any of them, produce or cause any unfair, unreasonable or unjust discrimination between individual risks, classes of risks, or territorial classification of risks:

"4. Into the fairness, reasonableness and justice of the rules and practices of said companies, whereby they divide the State of Virginia into five territorial divisions or groups, to-wit, 'Eastern Shore counties,' 'Piedmont counties,' 'Valley counties,' and 'General' (the last embracing all of the State not included within the first four divisions) ; and charge different rates and premiums upon the same class of risks, according to in which of said divisions the property insured is located; into whether said companies should be permitted to make these or any other territorial classifications in Virginia; and if any territorial classification should be permitted, then into what territory should be included in each territorial division, and into what are the fair and reasonable rates and premium charges to be made by said companies therein for insurance against loss or damage by fire and/or lightning.

"5. Into all other matters pertinent to what are fair,

just, reasonable, adequate and non-discriminatory rates and premium charges to be charged by said companies for insurance against loss or damage by fire and/or lightning in Virginia, and what are fair, just and reasonable schedules, rating methods, rules, by-laws, agreements, regulations and classifications to be applied and enforced in making application of such rates and premium charges."

On July 24, 1928, the stock fire insurance companies named in the order appeared by counsel and filed an answer which was subsequently amended. Briefly (as stated in the opinion of the Commission), the answer set forth:

"1. That the companies are entitled to charge rates which produce a fair and reasonable profit from insurance against loss or damage by fire and/or lightning.

"2. That any rates fixed and enforced by the Corporation Commission which do not produce from insurance against the risk of loss or damage by fire and/or lightning a profit which is fair and reasonable would be in violation of the Constitution of the United States and of the Constitution of the State of Virginia.

"3. That rates can be reduced only when it is shown that the rates charged for the five years next preceding are producing a profit in excess of what is reasonable.

"4. That five per centum of the earned premiums is a reasonable profit.

"5. That three per centum of the earned premiums is a reasonable profit allowance for the conflagration hazard.

"6. That the fair and reasonable manner to determine a profit or loss from rates charged is to deduct from earned premiums losses and expenses incurred and no consideration should be given to other branches of the business.

"7. That there are no unfair, unreasonable or unjust discriminations between risks in Virginia.

"8. That the five territorial subdivisions of Virginia are justified by experience.

"9. That no profit from rates charged during 1923-1927, inclusive, has been made in excess of what is reasonable.

"10. That the schedules filed by each company as required by the Commission are made a part of the answer of such company and objection is made to the consideration by the Commission of certain portions of said schedules.

"11. That chapter 433, of the Acts of Assembly of 1928 (Acts of Assembly of 1928, p. 1115) is unconstitutional."

Hearings were begun before the Commission on July 24, 1928, and continued from time to time, until March 29, 1929, at which time the record was closed.

The Commission called upon the companies for certain reports which should have supplied much of the basic data necessary to a determination of the profit produced by the rates charged over the five-year test period of from 1923 to 1927, inclusive. These reports were furnished but they were not satisfactory to the Commission which appears to have had considerable difficulty in obtaining them or securing accurate information relative to the profits produced by the rates charged. In the written opinion of the Commission it was stated that a large number of them were "so inaccurate, so impure and so distorted," and that the methods of accounting used were so different, that it rendered them absolutely worthless for use in an aggregate compilation. There were many errors in them which the' Commission thought was due to carelessness "and in some cases it is difficult to account for the errors having been made by any accountant making any reasonable effort to supply accurate information or approximately accurate information." The Commission stated that the errors detected threw a cloud upon the credibility of the aggregates obtained from the reports made by the companies to such an extent that the Commission was compelled to refuse to act upon them, and that *the reports, as made, clearly show that the public are entitled to a substantial reduction in rates.* The Commission said: "But whether the errors have been due to carelessness or other causes they are so gross as to be wholly indefensible and to cast an undeserved shadow upon the companies which have reported with substantial ac-

curacy." One company in its report to the Virginia Insurance Commissioner showed for the years 1923 to 1927, inclusive, an average yearly "Virginia underwriting loss" of 63.34% on its Virginia fire risks while the reports made by this company to the Commission in this case show for the same period an average yearly profit on its Virginia fire risks of 15.51%. The Commission says that every opportunity was afforded the companies to produce accurate statements and if the estimates arrived at by the Commission may be said to be conjectural it is because of the failure of the companies to furnish accurate information, necessitating the Commission using the best evidence available.

At the hearing the companies introduced a great volume of oral and documentary evidence as did the Commonwealth. Every phase of the case was thoroughly gone into before the Commission. The companies had a fair opportunity to introduce all of the evidence obtainable and they did introduce evidence tending to show that the rates charged by them at the time of the beginning of this investigation were reasonable, and that a reduction of those rates would not allow them a fair and reasonable profit in their business. In other words, the meaning of their contention was that if the Commission reduced the rates which were then being charged it would amount to confiscation. Able briefs were filed by counsel before the Commission and after oral argument by counsel the Commission handed down an extensive and exhaustive opinion in which every question raised before it was decided. The Commission denied the contentions of the insurance companies and entered its order finding that the rates charged for fire and lightning insurance in Virginia during the five years next preceding (1923 to 1927, inclusive) have produced and are producing unreasonable profits and that the rates filed for future application will produce a profit in excess of what is reasonable.

The pertinent part of the order follows:

"Now, therefore, it is ordered, that the rates filed by fire insurance companies for fire and lightning insurance (other

than sprinklered risks) in pursuance of chapter 433, Acts 1928, be, and are, hereby disapproved; and

"It is further ordered, that all fire insurance companies doing business in the State of Virginia, which under chapter 433, Acts 1928, are required to file their rates with the State Corporation Commission of Virginia be, and are, hereby required within thirty days from November 20, 1929, to submit to the State Corporation Commission of Virginia a classification, or classifications, of risks with rates applicable thereto which shall meet the approval of the State Corporation Commission of Virginia, and shall comply with the following provisions:

"(1) The said rates and classifications shall be such as to effect in the net premiums written by the 158 companies named in the caption hereof, numbered from 1 to 158, inclusive, a reduction in premium income of as near as may be eight hundred thirty-four thousand three hundred ten dollars ($834,310.00) per annum: * * *"

On February 8, 1930, another order was entered making certain changes in the previous order, which however are not important to the decision of the case.

The rates prescribed by the order were put into effect by the insurance companies and then they applied for an appeal to this court, which was provided for in the act, asking this court to review and reverse said orders and to enter such order as the Corporation Commission should have made.

■■ There are a number of assignments of error. The companies contended before the Commission that the State had no right to establish rates for the conduct of the insurance business; that the business was not affected with a public interest such as to authorize the exercise of the police power. They now concede that the point was not well taken. They also contended that section 15 of the act, exempting local mutual companies doing business in Virginia exclusively upon the assessment plan, operated unfairly and discriminated between stock fire insurance and such other companies doing business in competition with stock fire

companies, and that the act discriminates unfairly between insurance and other lines of business; whereby the statute denies to the stock fire companies the equal protection of the laws. These contentions were disposed of by the Commission adversely to the insurance companies. The Commission held:

"The same issues * * * were presented in the attacks made by the insurance companies upon the constitutionality of the Kansas and Missouri statutes, and * * * have been decided adversely to the contention of the companies by the Supreme Court of Missouri, the United States district courts for Missouri and Kansas and the Supreme Court of the United States. See *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; *Aetna Insurance Co.* v. *Hyde,* 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357; *Aetna Ins. Co.* v. *Hyde* (1929 U. S. Dist. Ct. for Western Dist. of Mo.), 34 Fed. (2d) 185; *German Alliance Ins. Co.* v. *Barnes* (C. C.), 189 Fed. 769; *Aetna Ins. Co.* v. *Hyde,* 315 Mo. 113, 285 S. W. 65. See, also, the following cases in which these issues are involved and decided adversely to the contention of the companies: *Insurance Co. of N. A.* v. *Welch,* 49 Okla. 620, 154 Pac. 48, Ann. Cas. 1918E, 471; *Citizens' Ins. Co.* v. *Clay* (D. C.), 197 Fed. 435, appeal dismissed in 235 U. S. 711, 35 S. Ct. 200, 59 L. Ed. 436; *State ex rel. Martin* v. *Howard,* 96 Neb. 278, 147 N. W. 689.

\* \* \* \* \* \* \*

"Upon principle and authority we are of opinion that the business of fire insurance is so far affected with a public interest as to give the State of Virginia the power to regulate the rates charged by fire insurance companies operating in Virginia on Virginia risks; that the classification of 'local mutual insurance companies and associations organized under the laws of the State (of Virginia) conducting business only in this State and exclusively upon the assessment plan' in a class different from that in which stock fire insurance companies are classed and exempting them from the provi-

sions of the act here in question is a reasonable classification and a reasonable exercise of legislative discretion, and does not render the statute void because of discrimination against stock fire insurance companies; * * *."

To the list of authorities cited may be added the recent case of *O'Gorman* v. *Hartford Fire Insurance Co.*, 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324.

The conclusion of the Commission so completely and satisfactorily disposes of those questions, and is so abundantly supported by authority, that we adopt it as our own and deem it unnecessary to say more upon those points.

The companies contended before the Commission that the act was unconstitutional because it did not provide that notice be given them of the institution of the investigation but this contention has not been stressed here. However, in passing, it is noted that the Constitution of Virginia and the statutes do provide for notice and the companies are given an opportunity to be heard and present evidence, and in this case they were given notice and they not only filed an answer but actually presented a great volume of evidence which is in the record.

Where the constitutionality of a statute is under review, the courts indulge a clear presumption in favor of its validity and the burden rests upon those who challenge it to prove that it infringes upon the Constitution.

In the case of *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Tompkins*, 176 U. S. 167, 20 S. Ct. 336, 338, 44 L. Ed. 417, the court said: "In approaching the consideration of a case of this kind we start with the presumption that the act of the legislature is valid, and upon any company seeking to challenge its validity rests the burden of proving that it infringes the constitutional guaranty of protection to property. The case must be a clear one in behalf of the railroad company or the legislation of the State must be upheld."

In *Munn* v. *Illinois*, 94 U. S. 113, 123, 24 L. Ed. 77, it was said: "Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless

it is clearly so. If there is doubt, the expressed will of the legislature should be sustained."

■■ Another point earnestly insisted upon by the insurance companies before the Commission was that section 9 of the act denies the companies to which in terms it expressly applies the equal protection of the laws, inasmuch as it does not apply to other insurers engaged in the same or similar business. They concede, however, that the distinction made in the act between mutual and stock companies, whereby the mutual companies were exempted from the act, was settled adversely to them in *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189. They therefore do not now urge that point here. However, they do contend here that in so far as section 9 of the act gives to the State Corporation Commission power to regulate the rates for insurance business of companies and does not give to the Commission power to regulate rates for the same business when done by individuals or partnerships or unincorporated associations, it deprives the corporate insurance companies of the equal protection of the law in violation of the Fourteenth Amendment. This point is founded on the particular language of the act which refers to the regulation of the rates of "companies" while other insurers are not mentioned. The Commission in holding adversely to this contention said:

"Chapter 433, Acts 1928, is not an isolated act, but must be read in conjunction with the general statutory law relating to fire insurance companies.

"Title 38 (chapters 167-175, sections 4169-4359) is the title of the Code of Virginia relating to 'insurance-general provisions'; and section 4200 of this chapter provides in part as follows:

" 'Section 4200. Definitions.—As used under this title of this Code: The words "insurance company" or "insurance companies" shall be held to mean and include any association, society, company, corporation, joint stock company, individual; partnership, trustee or receiver engaged in the

business of assuming insurance risks upon persons or property in this State (except fraternal benefit orders, associations or societies, as defined and regulated by chapter one hundred and seventy-one), and any bond investment company, association, or society, conducting a business including any of the features or principles of insurance.'

"Throughout the several chapters of the Code relating to insurance and in the acts relating to insurance which have been passed since the adoption of the Code of 1919, companies when used with reference to insurance is commonly used as including all insurers, whether incorporated or not, and we think is so used here by the legislature.

"This being true there is no basis in fact for the charge of discrimination * * *."

The disposition of this question by the Commission as indicated appears reasonable and sound and is sufficient.

The appellants contend that chapter 433 of the 1928 Acts of the General Assembly is unconstitutional because in violation of the due process clause (Fourteenth Amendment) of the Constitution of the United States. It is claimed that the statute in effect confers on the State Corporation Commission the power to fix the premium rates to be charged by the insurance companies but that neither that act, nor any other statute of the State, provides the companies a fair opportunity for submitting to a judicial tribunal for determination, upon its own independent judgment as to both law and facts, the question whether the rates so fixed are confiscatory of the companies' property. The act contains this provision: "An appeal shall lie from any order or decision of the State Corporation Commission to the Supreme Court of Appeals at the instance of the applicant or of any party in interest. The method of taking and prosecuting such appeal, in so far as is not fixed by law, shall be prescribed by the rules of the Supreme Court of Appeals." (Section 10.) But the appellants insist that this right of appeal is not sufficient to satisfy the constitutional requirements of due process of law because the Commission, in fix-

ing the rates, acted in a legislative capacity and under the powers conferred on this court by the State Constitution and statutes, the proceedings on appeal here are likewise legislative in character, and do not furnish an opportunity for a judicial determination of the question whether the rates fixed are confiscatory. *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150, is relied upon in support of this position. That case involved an order of the Commission fixing railroad rates. Under section 156 (g) of the State Constitution, in the event of a reversal of an order of the Commission establishing rates for transportation companies, this court may substitute therefor such order as the Commission should have made with respect to the fixing of the rate.

In the *Prentis Case, supra,* the Supreme Court of the United States expressed the opinion that this court is vested under our Constitution with transportation rate-making powers and when exercising these powers is acting in a legislative capacity. The opinion of Mr. Justice Holmes distinguishes between a decision that a future transportation rate *will not be* confiscatory and one that a present existing rate *is not* confiscatory, holding a decision of the former type legislative, and the latter judicial. This rule, if given the effect contended for by appellants, would preclude any court from judicially determining the confiscatory character of any future rate, not yet in operation, and confine the judicial determination of this question to rates which have been put into actual operation. That the rule is not so broad in its application appears from the later decision in the case of *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 40 S. Ct. 527, 529, 64 L. Ed. 908, in which certain water rates were challenged as confiscatory. The Superior Court of Pennsylvania (68 Pa. Super. Ct. 561) had reversed the Public Service Commission upon the ground that the property of the water company had been undervalued. The Pennsylvania Supreme Court (260 Pa. 289, 103 Atl. 744), however, reversed the Superior Court, hold-

ing that the latter court had no power to determine the question of confiscation. This case was heard on appeal upon the same record on which the Commission has based its findings before the rates became fixed. The Supreme Court held the rates invalid as in violation of the due process clause because the State appellate courts were not vested with jurisdiction to determine the question whether the rates were confiscatory. The court said the rates involved were future rates, and also: "Without doubt the duties of the courts upon appeals under the act are judicial in character—not legislative, as in *Prentis* v. *Atlantic Coast Line Co., supra.* This is not disputed; but their jurisdiction, as ruled by the Supreme Court (of Pennsylvania), stopped short of what must be plainly intrusted to some court in order that there may be due process of law." The inference from this language is clear that if the State appellate court's jurisdiction had included the power to determine that constitutional question, such determination still would have been judicial in character and would have satisfied the constitutional requirements as to due process of law. And the view that the rule laid down in the opinion of Mr. Justice Holmes in *Prentis* v. *Atlantic Coast Line Co., supra,* was intended to be restricted to the questions then before that court, involving as they did the transportation rate-fixing powers of this court under section 156 (g) of the Virginia Constitution, is further strengthened by Mr. Justice Holmes' concurrence in the dissenting opinion of Mr. Justice Brandeis in *Ohio Valley Water Co.* v. *Ben Avon Borough, supra.* The dissenting justices were of opinion that the Pennsylvania appellate courts had actually exercised jurisdiction to determine whether the rates fixed by the Commission were confiscatory, by deciding that the evidence supported the Commission's rate. And the dissenting justices considered apparently that this right of review by the water company in the State appellate courts fulfilled the requirements of due process of law. See, also, *Bacon* v. *Rutland R. Co.,* 232 U. S. 134, 34 S. Ct. 283, 58 L. Ed. 538.

It is difficult, if not impossible, to define at what point in cases like this the reviewing power of an appellate court enters the legislative field. The appellants claim that the conferring of any legislative power whatsoever on the court in any appellate proceeding before it, converts the entire appeal into a legislative proceeding exclusively, and supersedes and extinguishes all the court's judicial functions therein; that if the court has any legislative power in such a case, it has no judicial power; that if the appellate court is given the power to substitute what it conceives to be a proper rate in the place of an improper one fixed by the Commission, this deprives it of the power to render a judicial decision that any rate fixed by the Commission is not confiscatory as a matter of law.

The Supreme Court of Appeals was created by the Constitution of Virginia and invested with the judicial powers of review inherent in an appellate court. No act of the legislature can divest it of these powers by conferring additional legislative powers upon it, and any statute which would have any such effect would be obviously in contravention of the State Constitution.

It may be conceded that section 156 (g) of the Constitution does confer upon this court the rate-fixing power with respect to transportation and transmission companies, because thereby this court is required in the event of reversal of the Commission, to substitute its judgment in such matters in the place of the judgment of the Commission. Whether the effect of this is to supersede all judicial powers to determine whether such a rate, deemed proper by this court, is confiscatory, we need not now decide, because this proceeding does not involve the rate of a transportation or transmission company.

But the appellants contend that section 156 (f) of the State Constitution confers on this court legislative powers in all cases of appeal from the State Corporation Commission involving legislative action by the Commission. If their argument is sound, then this court does not possess

in any case any power of judicial review of any legislative action of the State Corporation Commission. Section 156 (f), so far as here pertinent, provides that no new evidence may be introduced in the appellate court, but all evidence taken before the Commission, essential for a proper decision here, shall be certified to this court. It provides further: "The appellate court shall have jurisdiction, on such appeal, to consider and determine the reasonableness and justness of the action of the Commission appealed from, *as well as any other matter arising under such appeal;* providing, however, that the action of the Commission appealed from shall be regarded as *prima facie* just, reasonable and correct." It is further provided that any case may be remanded to the Commission when the public interest requires.

The appellants contend that the powers of legislative review and judicial review are so inconsistent as to be mutually exclusive, and that section 156 (f) should be construed as conferring the former power and denying the latter. But the primary and inherent function of this court is that of judicial review, and to construe any constitutional provision as converting this into a legislative tribunal and abolishing its judicial functions when reviewing the Commission's legislative actions would be justified by only the clearest and most compelling language. Considering that the constitutional convention employed such language in section 156 (g), conferring legislative powers as to rates of transportation and transmission companies, and omitted to include such power to substitute our judgment for that of the Commission in section 156 (f) as to other appeals, it is highly persuasive that no such powers were intended to be conferred by section 156 (f). Constitutional language conferring powers on an appellate court, should be construed as intended to include only those powers consistent with the discharge of the inherent judicial functions of the court. It would require clear and strong language to justify such a construction as would divest the court of its primary duty, that of judicial review. And particularly would this be true if

appellants' contention be correct, that our Constitution and statutes provide no other opportunity for judicial review of the Commission's legislative actions unless it be the appeal to this court.

But whether the powers of legislative and judicial review be mutually exclusive of exercise at the same time by one tribunal (and we do not here decide this question), we are of opinion that the provisions of section 156 (f) were intended to relate solely to those duties and powers normally incident to the discharge of the court's judicial functions, and that the language of the section does not justify an interpretation which would extend their scope to embrace legislative powers.

The appellants insist, however, that section 3734 of the Code should be construed as conferring legislative powers on the Supreme Court of Appeals, and as authorizing us to substitute our opinion as to what is a proper rate in this case for that of the Commission—but we cannot accept that view. The language must be taken as referring to judicial powers, not those outside the normal field of appellate jurisdiction. As said in *Reagan* v. *Farmers' Loan and Trust Co.*, 154 U. S. 399, 14 S. Ct. 1047, 1055, 38 L. Ed. 1014: "* * * it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates, etc."

Our conclusion therefore is, that in reviewing the action of the Commission in framing the insurance rates here involved, this court will not disturb the action of the Commission unless it appears that the Commission has exceeded its constitutional or statutory powers; or that its action has resulted from an unreasonable exercise of its authority; or that it is based upon a mistake of law, or is contrary to the evidence or without evidence to support it; or, finally, that the rate fixed is so low as to amount to confiscation and deprive the regulatees of their property without due process of law.

The appellants contend that the Commission, in

establishing the rate, based it upon not only the premium charge but also upon all of the capital, surplus and undivided profits invested both within and without the State of Virginia. They assert that the insurance business is divided into two separate and distinct branches—(1) the underwriting business and (2) the investment business—and that in establishing the rate the Commission considered the investment branch of the business when it should only have considered the underwriting branch.

By adverting to the opinion of the Commission it is clear that the capital, surplus and undivided profits were not considered in fixing the rate. For instance, the Commissioner says:

"The amount of profit that a fire insurance company may be able to make from the investment of its capital, surplus and undivided profits has no bearing on the amount of the *profit produced* by the rates charged during a given year or period; but it is very important factor to be considered along with other factors in determining whether the profit produced by the rates charged is in excess of a fair and reasonable profit.

"What, then, are the profits produced during any given period by rates charged?

"Though it has been questioned by some courts, it seems to us to be self-evident that all profits of an insurance company during any given period which are not derived from the investment of its (1) capital, (2) surplus, (3) undivided profits, and (4) borrowed capital must be *profits produced by rates charged.*

\* \* \* \* \* \* \*

"Profits from investment of capital, surplus, undivided profits and borrowed money are not profits produced by rates; but income from (a) premiums paid by policyholders, and (b) income from the investment of premium income which is being held to meet presently existing but future payable liabilities, are both income produced by

rates, and should be included in computing profits produced by rates.

\* \* \* \* \* \* \*

"The amount paid by the policyholder may be properly regarded as the present worth of the premium actually charged; and, therefore, the profit element of the premium should be increased by the interest received on that portion of the premium held by the company in its treasury to meet presently existing but future payable liabilities properly payable out of the premium, or only so much of the premium as will, with interest, meet such liabilities when and as they become fixed and payable, should be deducted from the amount of the premium paid in determining what part thereof is profit. Income and liabilities should be stated in the same terms. If premiums are to be paid on the basis of present worth, then liabilities should be stated in terms of the amount which, with interest, will meet the liability when payable.

"It would appear to be just as reasonable in computing profit made from the purchase and sale of a flock of sheep to omit from the computation the income received from the wool clip and the natural increase at the lambing season, as to discard in the computation of profits produced by rates the increase in income due to the investment of that portion of the premiums held in hand to meet existing but future payable liabilities.

"Where profits produced by all rates charged by a company for all classes of insurance written in all territories in which the company does business is under consideration, the *'profits produced by rates'* is properly computed by including in the income account all income received by the company *except* (1) interest, dividends, rents and other income from the investment of (a) capital, surplus and undivided profits, and (b) borrowed sums; and (2) sums received through sale or maturity of ledger assets (*i. e.*, receipts used in ascertaining profit or loss from sale or maturity of stocks, bonds and other property).

\* \* \* \* \* \* \*

"However, where the profits under consideration are those produced by rates on only certain classes of insurance written by the company, as fire and lightning insurance, and only on the business done in some one State, as Virginia, the income produced by rates may be computed with some, though not large, understatement of profits by (1) taking the premiums charged policyholders, and (2) adding thereto interest at the rate actually being earned by the company on that part of the premium income which is necessarily being held in the treasury to meet the presently existing but future payable 'liability on unexpired policies,' and is or ought to be invested in interest-bearing securities or otherwise put out at interest."

The foregoing quotations from the opinion of the Commission demonstrate that it did not consider the investment branch of the business in establishing the rate, but that it only considered the profits from premiums charged and the interest, at the rate actually being earned by the companies, on that part of the premium income which is held as a reserve to meet actual liability on unexpired policies. In the computation, the capital, surplus and undivided profits were not used.

In Virginia, we have the following statute, Code, section 4311: "To determine the liability on the contracts of insurance of any such insurance company organized under any law of this State, whenever such company renders an annual statement to the Bureau of Insurance, or when an investigation of the company is made by the Commissioner, there shall be reserved on all risks in force on any cargo, or on any goods, merchandise, or other property in course of transportation, the insurance on which shall cease upon the arrival of such cargo, goods, merchandise or other property at its destination, the whole amount of original premiums charged for such risks. On all risks written for a fixed time, not exceeding one year, there shall be reserved fifty per centum of the whole original premiums charged for such

risks. On all risks written for a fixed time, and for a time exceeding one year, there shall be reserved the pro rata unearned portion of the whole original premiums charged for such risks; and in calculating the pro rata unearned portion of such premiums, it shall be assumed that the policies date from the middle of the year in which they were issued."

Under the foregoing statute the appellants contend that the reserve therein defined was conclusive upon the Commission and it was bound to follow it; that it constituted a legislative determination of what constituted the liability on contracts of insurance; and that the Commission was without power to inquire whether the said statutory measure of liability represents the actual sum required by the companies to enable them to fully meet their unmatured and contingent obligations. The Commission, however, did not follow that statute but took the position that section 9 of the rating act was a clear mandate to it to consider for purposes of rate regulation all actual profits produced by rates charged, regardless of whether they are included in the technical definition of "underwriting profits" or not, or whether they are indicated by annual statements of the insurance companies or not; "and to free it, in determining such actual profits, from pre-existing arbitrary statutory provisions enacted for purposes of testing the solvency of fire insurance companies, legal fictions and the restrictions of technical definitions; and to remit its regulatory agency to the use of any and all correct principles for the computation of actual profits produced by rates charged."

The Commission says that Code, section 4311, was enacted for the purpose of testing the solvency of the companies, and has nothing to do with a determination of profits as a basis for rate-making. The test applied by the Commission was the measure of actual liability upon "unearned premiums," and this was produced by the essential facts introduced. The basic theory upon which the Commission proceeded is apparent from the following taken from the opinion:

"As we shall hereafter see, the Virginia experience of the companies during the test period shows that the 'unearned premium reserve' is more than sufficient to take care of this liability in the orderly conduct of the business of the companies as going concerns or upon liquidation.

"The so-called 'unearned premiums,' or 'unearned premium reserve' of a company has no natural relation to the computation of the profits made by an insurance company during a given period *except* to the extent that 'unearned premiums' at any given time may be in fact a correct present measure of the amount ultimately developed by the experience of the company as the amount necessary to pay, as the several items thereof become fixed and payable, its thereafter incurred (1) return premiums, (2) losses and (3) expenses in and about the performance of its obligations under its unexpired policies.

\* \* \* \* \* \* \*

"It is no more in accordance with the facts to take the total sum that an insurance company must pay to its policyholders if all policies be cancelled, as the present measure of its liability at any given time on its unexpired policies for cancellations and return premiums, than to take the average amount of the risks written as the present measure of its liability to policyholders on its unexpired policies for loss. Liability for loss and liability for cancellation are both purely contingent; and loss or cancellation are both the exception and not the rule. Except in so far as it can be shown to be in accordance with past experience, there can be no logical basis for taking the total amount of loss payable if there be a total loss under all unexpired policies, or the total sum payable if all unexpired policies be cancelled as the present measure of the aggregate liability on unexpired policies for losses, expenses and return premiums on account of cancellations and rate adjustments."

The rating act of 1928 contains no reference to section 4311. It does not provide that the Commission was bound to accept the methods there outlined in establishing insur-

ance rates, but it does expressly provide that the Commission should exercise its judgment and discretion in ascertaining the profit and fixing the rate.

The conclusion of the Commission upon this branch of the case is supported by the evidence. It is reasonable and sound and this court would not be justified in disturbing it.

The remaining assignments of error are to a large extent directed at the method adopted by the Commission in arriving at the profits derived from the rates charged; computation of the correct percentage to be charged as investment expense; the methods of insurance accounting; expense of operation; ascertaining the percentage of the conflagration hazard and alleged miscalculation of profit. These assignments present all of the difficult questions that are usually raised in such cases. Exactness and accuracy in such matters are not always attainable. We do not feel justified in this case in holding that the Commission committed error. If error was committed it has not been pointed out to us in a manner that is convincing. As said by Prentis, P., in *Chesapeake & P. Telephone Co.* v. *Com.*, 147 Va. 43, 136 S. E. 575, 578, in speaking of the conclusions of the Commission: "Unless such conclusions are accorded great weight, then public regulation will become a mere gesture." The burden of showing that the rates filed by the appellants were reasonable was upon them. The evidence fails to overcome the legal presumption in favor of the rates established by the Commission. As has already been said, in reviewing the action of the Commission in fixing insurance rates, this court will not disturb its action unless it appears that it has exceeded its authority, or has acted unreasonably in exercising its authority, or that it has made a mistake of law, or that its finding is contrary to the evidence or without evidence to support it, or that it is fixed so low as to amount to confiscation. It does not appear that any of these grounds exist in this case. The record affirmatively shows that the companies received a fair and impartial hearing; that the Commission made every reason-

able effort to arrive at the true condition of the insurance business in Virginia and it filed with the record an exhaustive and carefully prepared opinion in which all questions raised were fairly decided. Upon the whole case we are of opinion that the rates established are not confiscatory and that the findings of the Commission in framing same are clearly supported by the evidence. As was said in *Chesapeake & Potomac Telephone Co. v. Com., supra,* "there is nothing irrevocable, however, about such a conclusion, for such rates are never permanently fixed, but are always subject to revision. If after a fair trial they prove to be inadequate or unjust the question can be again reopened before the Commission without difficulty."

 This court would not be justified in considering the present economic depression upon this appeal.

The order of the State Corporation Commission is affirmed.

*Affirmed.*