## Richmond

AMERICAN DRUGGISTS' INSURANCE COMPANY V. COMMONWEALTH OF
VIRGINIA.

October 12, 1959.

Record No. 4990.

Present, All the Justices.

The opinion states the case.

*David Meade White* and *David P. Pickrel* (*White, White &
Roberts,* on brief), for the appellant.

*Collins Denny, Jr.* and *Claude D. Minor* (*A. S. Harrison, Jr., Attorney General; John W. Knowles, Assistant Attorney General,* on
brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The American Druggists' Insurance Company appeals from an
order of the State Corporation Commission which denied its applica-

tion for a uniform 25% downward deviation from the rates approved by the Commission for fire and allied lines of insurance written by the appellant.

The Company's application for the deviation was filed pursuant to Code § 38.1-258, which in part provides:

"* * * any such insurer may make written application to the Commission for permission to file and use a uniform deviation from [the established rates]. Such application shall specify the basis for the deviation and shall be accompanied by supporting data upon which the application relies. * * In considering the application for permission to file and use such uniform deviation, the Commission shall give consideration to all available statistics and the principles of rate making as provided in this article [Article 4, Chapter 6, Title 38.1 of the Code]; and

* * *

"The Commission shall issue an order permitting the uniform deviation or modification for such insurer to be filed and used if it is found to be justified. The Commission shall issue an order denying such application if it finds that the deviation or modification is not justified or that the resulting premiums would be excessive, inadequate or unfairly discriminatory."

As provided by said section the Commission held a hearing on the application, at which the only witness was an officer of the Company who testified and filed exhibits showing the Company's assets and liabilities; its premiums, expenses, losses and profits, countrywide and in Virginia, both with and without the deviation, for the five-year period 1953-1957; and its experience contrywide and in Virginia over the same period after reinsurance of a part of its risks. The evidence so introduced established generally these facts:

The appellant is a stock insurance company of Ohio, organized in 1906, engaged in writing fire insurance and allied lines but only on the property of druggists. All of its stockholders are druggists or members of druggists' families. It insures approximately one-half of the retail druggists in Virginia and the forty other States in which it operates. It is a small but strong and successful company with a ratio of assets to liabilities at January 1, 1958, of $5.63. It has been doing business in Virginia since 1922 and for each year of that period until 1958 it has been allowed a deviation from the established rates of 25% in Virginia and the same amount in about one-half the other States and 20% in the remaining half. With these

deviations it had for the five-year period a margin for profit and contingencies of 28.3% countrywide and 21.4% in Virginia. Giving effect to its reinsurance program this margin was 37.7% countrywide and 32.1% in Virginia. This reinsurance amounted to 43% of premiums countrywide and the Company receives from this source more than the commission it pays to its agents.

A majority of the Commission, Chairman Hooker dissenting, decided that the 25% deviation applied for should be denied for the reason that it had not been justified under § 38.1-258, and the application was accordingly dismissed, with leave to the Company to file for such deviation as it could justify (15% as referred to below) "under the previous order of this Commission in Case No. 13556." That case was on the application of the Insurance Company of North America and another for a downward deviation of 10% from the manual fire insurance rates.[1] The application was denied because the expenses of the applicants exceeded the expenses permitted by the Commission for a 10% deviation under "the formula established by the Commission for the regulation of the rates charged for fire insurance by all companies doing business in this State * * as follows:

| | |
|---|---|
| Losses | 50.25% |
| Conflagration or Catastrophe Allowance | 2.25% |
| Expenses | 42.50% |
| Underwriting Profit | · 5.00% |
| Total | 100.00%" |

It is quite clear that taken by itself and considered apart from the rate pattern established and used in Virginia for many years, the appellant has shown that the 25% deviation applied for could be allowed without danger to its policyholders. Its case, however, cannot be considered in a vacuum. The Company's witness agreed that the basic rates should be fixed on the experience of all companies in its field and that has long been the practice in Virginia.

As pointed out above, the statute requires the Commission to "give consideration to all available statistics and the principles of rate making as provided in this article [4] * *." Section 38.1-252 in that Article prescribes the principles of rate making.[2] These principles were con-

---

[1] The manual rates are those established by the Commission for all companies and published in a manual.

[2] "(1) Rates shall not be excessive, inadequate or unfairly discriminatory;
* * *

"(3) Due consideration shall be given to past and prospective loss experience within

sidered by the Virginia Insurance Rating Bureau in fixing the manual or basic rates approved and established by the Commission for the appellant and all other insurance companies writing fire insurance and allied lines.[3]

In fixing rates a definite pattern has long been approved and used in this State. Following the enactment of Chapter 433, Acts 1928, and pursuant thereto, the State Corporation Commission made a full-scale investigation of rates proposed to be charged by fire insurance companies, and delivered an opinion in January, 1929, setting forth its findings, 1929 Report of the State Corporation Commission, page 29, and which was subsequently affirmed in all respects in *Aetna Insurance Co.* v. *Commonwealth*, 160 Va. 698, 169 S. E. 859. Among the Commission's findings and conclusions were these:

"It is a well known fact that business conditions suggest the advisability of the application of common rates by all insurance companies upon the same classes of risks within any given territory. * * * and that these common rates shall be based upon the composite or aggregate Virginia experience of all fire insurance companies subject to the act, and not upon the individual experience of some one company."

After reviewing the evidence as to a proper allowance for expenses in establishing the rate structure the Commission concluded:

"In view of these facts it would appear that the ratio of Expenses Incurred on Virginia fire business (exclusive of sprinklered risks) to Virginia Net Fire Premiums Written (exclusive of sprinklered

---

and outside this State, to conflagration or catastrophe hazards, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders or members or subscribers, to past and prospective expenses both countrywide and those specially applicable to this State, and to all relevant factors within and outside this State; and in the case of fire insurance rates consideration shall be given to the experience of the fire insurance business during a period of not less than the most recent five-year period for which such experience is available;
* * * ."

[3] The insurance laws of Virginia were revised and recodified by the 1952 General Assembly, Acts 1952, ch. 317, p. 422, and appear in Title 38.1 of the present Code. Section 38.1-226 continues the Virginia Insurance Rating Bureau created by Acts 1928, ch. 433, p. 1115. All insurance companies, stock, mutual and others, doing business in this State, with exceptions not here pertinent, are members of that Bureau, § 38.1-227, which is required to file rate schedules on behalf of each and every member of the Bureau, § 38.1-232, with right of appeal to the Commission, § 38.1-235. Filings became effective when approved by the Commission, § 38.1-253.

risks) ought not to exceed for any company 42 per cent and certainly should not exceed 42½ per cent."

The decision of the Commission was that the rates then being reviewed should be reduced, and in that connection it said:

"We further find that in order that the rates now charged and proposed to be charged in Virginia for fire and lightning insurance, other than sprinklered risks, shall produce a fair and reasonable profit only, the present and proposed rates should be so reduced that the net income produced by rates as herein defined shall not exceed 5 per cent of net premiums written plus a conflagration allowance of 2¼ per cent or a total of 7¼ per cent of net premiums written; * *."

From this decision came a formula for establishing fire insurance rates of which the component parts are these proportions of the manual premium dollar: For losses and conflagration, 52.50%; for all expenses, 42.50%; for profit, 5.00%. The appellee's brief asserts without contradiction that this formula is the yardstick which the Commission has used since 1928 to determine whether fire insurance rates are excessive, inadequate or unfairly discriminatory. It gives consideration to the elements which § 38.1-252 says shall be considered in making and establishing insurance rates. Not all insurance companies, or perhaps none, will have an experience identical with the formula, but it is based on the composite experience of fire insurance companies doing business in Virginia in accord with the principles stated in the *Aetna* case, and with § 38.1-252(3) of the Code, *supra.*

Prior to 1948 there was no specific statutory basis upon which the Commission could disallow a proposed variation or deviation from the manual rates. In that year certain amendments were made to the insurance laws by Chapter 402 of the Acts of Assembly of that year, and § 6 thereof set up a procedure for deviation to the same effect as that now provided by § 38.1-258, *supra.* Apparently the first hearing thereafter by the Commission on an application for a downward deviation from manual rates for fire insurance companies and the first declaration of policy with respect thereto was on the application of General Insurance Company and another for a 20% downward deviation. The application was denied by the Commission by an order entered in May, 1950, in which it was said:

"* * * the Commission has not only the duty to protect the insurance purchasing public against excessive or unfairly discriminatory

rates, but also the policyholders, and the investors in the insurance business against inadequate rates.

"* * * The Commission cannot view this application solely from the standpoint of the General Insurance Company and the First National Insurance Company but must consider the fact that if this application is approved many other companies doing business in this State probably will file similar applications in order to protect themselves against the competition resulting from the writing of this kind of business by the applicants." 1950 Report of the State Corporation Commission at p. 46.

In 1956 Allstate Insurance Company applied for a downward deviation in rates involving changes in classification of risks. The Commission denied the application and its holding was affirmed in *Allstate Insurance Co. v. Commonwealth*, 199 Va. 434, 100 S. E. 2d 31. In its opinion in that case the Commission said:

"All insurers do not operate in the same manner, and an insurer which by reason of its method of operation can operate at less cost should be permitted to pass on to the public such savings as result therefrom in the form of lower rates. This is fair both to the company and to the public and it has been the policy of the Commission to permit those companies which have lower expense ratios than those established for all companies to deviate from the rates fixed by the Commission on the basis of such lower expenses."

In the present case if a deviation of 25% from the manual rates were granted, then the expense ratio of the appellant for the five-year period ending in 1957 would be materially higher than the ratio allowed by the formula adopted by the Commission. The rate analyst of the Commission's Bureau of Insurance calculated that under the formula a deviation of only 15% could be allowed,[4] and it was suggested to the appellant that such a deviation would be approved if requested. Appellant declined the offer. Its witness testified: "We say that there is nothing wrong with the formula but any company that has improved on that formula, and has fully justified the deviation, should have a right to use it." He was asked: "Your position is that separate rates should be charged each year for each

---

[4] This was on the basis that on a deviation of 25% the deviated dollar is only 75% of the manual rate dollar, or 75 cents. The loss factor of 52.5 cents in the formula would therefore have to be increased to 70 cents (52.5 divided by 75%). Hence, the expense ratio of the applicant could not exceed 25% to justify a 25% downward deviation. Its expense ratio in Virginia for the five-year period of 1953-1957 was shown to be 35.4%.

company that requests separate rates?" He replied: "If they can justify it and the statute permits it."

It is not difficult to see what such a practice would do to the rate pattern that the Commission has established. The appellant insures only the property of druggists. By so selecting its risks it has had a favorable loss experience, the risk from conflagration is lessened and it profits from its reinsurance program. If all of these elements must be considered in establishing its rates, all other companies similarly situated would be entitled to like treatment. The result could be very high rates on non-select risks and a hodgepodge of insurance rates following no definite pattern.

In the memorandum opinion filed by the majority of the Commission in support of the order, it is appropriately said:

"In the making of insurance rates, uniform rates for all companies are based on the statistics applicable to all companies as a group. * * In making the manual rates the first thing to consider is the permissible loss ratio, which is computed on the basis of all available statistics. * * For purposes of making rates, however, the loss ratio for all companies is treated as the expected loss ratio of each company. The fact that a particular applicant for a deviation has had a better than average loss ratio has never been allowed as a ground for permitting a deviation."

"The basis for allowing a deviation is that the applicant has lower expenses than the average company. * * The applicant says that it has in fact reduced its expenses by making reinsurance agreements. The Commission has no jurisdiction over reinsurance agreements. * * The fact that risks are reinsured does not influence in any way the making of manual rates. In passing on deviations from manual rates the statute requires us to consider the principles of rate making applicable to the fixing of manual rates. * * Rate making deals with the premiums collected by the companies from the public, and not with transactions entered into by a company apart from its relations with the public."

"* * * The statutory requirement for fixing rates is that they must not be too high or too low. It is extremely important that they be high enough to keep the companies solvent. * *."

The allowance of a 25% deviation to the present applicant would not, on the basis of the data furnished by it, endanger its solvency. It would result, of course, in charging its policyholders smaller premiums, but the saving could be accomplished by paying to them the same amounts in dividends. As stated by the Commission in the

majority opinion, "The question involved is merely whether the company should distribute the profits after it has earned them or before it has earned them." In answer to a question of why the Company did not write a participating policy, its witness replied that it preferred not to do that from a selling standpoint. "A deviation now at the beginning makes it easier to sell the insurance * *. * * the buyer would rather have his 25 per cent now than hope to get it later at the end of the period."

Moreover, a 25% deviation would have to be based in part on appellant's favorable loss experience and its reinsurance credit. The first is not predictable. In 1953, for example, the loss ratio of the appellant was 106.1% and in the next year it was 8.6%. Reinsurance is not within the control of the Commission and is never used in establishing the manual rates. On the other hand, the expense element of the formula is an area in which economic operation and sound business policies control. It affords a safe and practical basis within the statutory requirements for determining whether a downward deviation should be allowed from the rates established for all companies in accordance with the statutes.

In refusing the deviation in the amount requested by the appellant the Commission did not exceed its constitutional or statutory powers or unreasonably exercise its authority. *Allstate Insurance Co.* v. *Commonwealth, supra,* 199 Va. at 443, 100 S. E. 2d at 37.

The order here complained of is accordingly

*Affirmed.*