## Richmond

HARFORD MUTUAL INSURANCE COMPANY v. COMMONWEALTH OF
VIRGINIA, ET AL.

January 18, 1960.

Record No. 5002.

Present, All the Justices.

The opinion states the case.

*John J. Wicker, Jr.* and *E. Ballard Baker* (*Wicker, Baker & Goddin,* on brief), for the appellant.

*Claude D. Minor* and *Collins Denny, Jr.* (*A. S. Harrison, Jr., Attorney General; John W. Knowles, Assistant Attorney General,* on brief), for the Commonwealth, et al.

*William H. King,* on brief, for Virginia Association of Insurance Agents, amicus curiae.

BUCHANAN, J., delivered the opinion of the court.

Harford Mutual Insurance Company appeals from an order of the State Corporation Commission entered October 9, 1958, denying its application for a uniform 20% downward deviation from the manual rates filed by the Virginia Insurance Rating Bureau and approved by the Commission for use by the appellant and other insurers writing fire and allied lines of insurance in Virginia.

The application for the deviation was filed pursuant to § 38.1-258 of the Code, which requires every member of the Bureau (which includes the appellant) to adhere to the filings made on its behalf by the Bureau, except that any such insurer may apply to the Commission through the Bureau for permission to file and use a uniform deviation from the manual rates. In considering the application "the Commission shall give consideration to all available statistics and the principles of rate making as provided in this article [Article 4, Chapter 6, Title 38.1 of the Code]; * *."*

At the hearing by the Commission on the application testimony on

---

* Section 38.1-252 of this article prescribes the principles of rate making to be used by the Bureau in fixing the manual rates to be approved by the Commission for use by the appellant and all others writing fire insurance and allied lines, as follows:

"(1) Rates shall not be excessive, inadequate or unfairly discriminatory;

"* * *

"(3) Due consideration shall be given to past and prospective loss experience within and outside this State, to conflagration or catastrophe hazards, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders or members or subscribers, to past and prospective expenses both countrywide and those specially applicable to this State, and to all relevant factors within and outside this State; and in the case of fire insurance rates consideration shall be given to the experience of the fire insurance business during a period of not less than the most recent five-year period for which such experience is available; * *."

behalf of the Company was given by its president and its vice president and secretary. The rate analyst of the Rating Bureau and the Commission's deputy commissioner of insurance testified in opposition to the application. With the oral evidence were filed a number of exhibits. The general purport of the evidence was as follows:

The appellant is a well managed and prosperous mutual insurance company which was chartered in Maryland in 1842 and began doing business in Virginia in 1928. From that time until 1947 it was allowed a 25% deviation downward from the manual rates. In the latter year, following a general rate reduction, it requested and was allowed a 20% deviation and used that deviation from the manual rates through 1957. From 1928 through 1957 its direct premiums at the deviated rates were $12,680,652 and it paid losses of $5,457,723, representing a loss ratio of 43.03%. For the five-year period 1952-1956 (required to be shown by § 38.1-252) its countrywide direct premiums totaled $23,936,957; its expenses (consisting of loss adjustment, commissions and other acquisition expenses, general expenses, taxes and fees, profits and contingencies) were $10,432,686, a ratio to premiums of 43.6%; its losses were $13,504,271, a ratio of 56.4%.

Its Virginia experience for the same period on the same items showed premiums of $5,365,311, expenses $2,945,339, a ratio of 54.9%; and losses $2,419,972, a ratio of 45.1%.

The Company cedes to or reinsures with two other insurance companies (Lloyds of London and Maryland National Insurance Company, a stock company partly owned by Harford) about 40% of its risks and receives therefor commissions of about 43% as against about 25% paid to its Virginia agents. By its reinsurance contracts it limits its liability on any risk to $4,000 up to $15,000, depending upon the character of the risk. The Company also asumes, i.e., buys, insurance risks from other companies, but cedes much more than it buys. Reinsurance is a common practice among insurance companies.

For Virginia risks for the period 1953-1957 not ceded but retained by the appellant, and giving effect to the results of its reinsurance program, its net premiums totaled $3,206,000 its losses $1,485,000; its loss adjustment expenses, commissions and all other expenses $976,000, leaving a surplus of $745,000. The Company has always had a surplus on Virginia business at the deviated rate.

The Company has no capital stock and pays no dividends to policy-holders in Virginia. In this and some of the other States it operates on a deviation basis and carries its net earnings to surplus. In other

States it sells insurance on a manual rate basis and pays dividends to its policyholders from its net earnings. About 20% of its business is written on the dividend basis.

It is not questioned that the approved formula for the fixing of fire and allied insurance rates in Virginia has at all times for the last 30 years been as follows: Allowance for losses—50.25% of the manual premium dollar; for conflagration or catastrophe—2.25%; for expenses—42.50%; for underwriting profit and contingencies—5.00%.

The reason assigned by the majority of the Commission for denying the application for the 20% deviation was that deviation in that amount had not been justified under the provisions of § 38.1-258 of the Code, *supra*. Chairman Hooker dissented and was of opinion to approve the requested deviation "for the reason that it has been justified by the evidence herein." The application was dismissed with leave to the appellant to file for such deviation as it could justify, which the rate analyst for the Commission's Bureau of Insurance found to be 10%, on the basis of the figures submitted by the Company with its application showing its experience in Virginia and countrywide for the five-year period 1952-1956. He found that for that period, on the basis of the direct premiums written by the Company and its expenses actually paid, without considering reinsurance, but including the profit factor of the formula, a 20% deviation would show a formula deficit of $372,961 on Virginia business, and $2,250,662 on countrywide business; and that a 20% deviation from the manual rates on Virginia business for the same period would reduce the 5% profit factor of the formula to a minus 2%, while a 10% deviation would leave a profit factor of 5.3% as against the formula profit factor of 5%.

In its opinion in support of its order the majority of the Commission held that the basis for allowing a deviation "is that the applicant has lower expenses than the average company."

In our opinion in the case of *American Druggists' Insurance Co.* v. *Commonwealth*, decided last October, 201 Va. 275, 110 S. E. 2d 509, we approved that ruling, saying, "It affords a safe and practical basis within the statutory requirements for determining whether a downward deviation should be allowed from the rates established for all companies in accordance with the statutes."

The appellant in the present case contends that the Commission erred: (1) in disregarding its favorable loss experience; (2) in disregarding its reduction of expenses through reinsurance; (3)

in disregarding its income from investment from unearned premiums; and (4) in requiring the application of the formula's 5% factor for profit to it, a mutual insurance company.

In *American Druggists* we decided the first two points. We said the 25% deviation applied for in that case and denied would have to be based in part on that appellant's favorable loss experience and its reinsurance credit (which returned commissions of 43% as in the present case), the first of which was not predictable and the second was not within the control of the Commission and was never used in establishing the manual rates. It may be added here that the Commission has no jurisdiction of the reinsuring companies and it appears that the reinsurance contracts may be cancelled at any time on 90 days' notice. We adhere to the conclusion reached in *American Druggists* that these reinsurance contracts are not factors that should be given weight on a deviation application.

The vice president and secretary of the appellant conceded that with its reinsurance program excluded it could not operate on a 20% deviation and have enough left after paying expenses to cover the 52.5% set up in the formula for losses.

With respect to item (3) above, appellant says that while in the making of fire insurance rates it is entirely proper to ignore income derived from investment of previously accrued surplus, it is not proper to ignore income from the investment of current funds on hand. The amount claimed for this item does not specifically appear. It seems to result from the reinsurance agreements. The vice president and secretary of the Company testified that it settled with its reinsurer, Lloyds, quarterly, but "at all times we withhold from the insurer the amount of unearned premium that amounts to in excess of one million dollars that we are holding in our possession that is re-invested." The appellant's evidence was to the effect that the Company's average income from investment was approximately 3.15%. On this basis appellant states in its brief that its investment income from this source amounts to something over $32,000 a year. The Company's annual report to the Commission for 1957 stated its average net rate of return to be 2.3%. That report also indicates that this item was taken into consideration in making the manual rates. In any event it is not an amount that would change the result in this case.

Finally, the appellant contends, item (4) above, that the 5% profit factor of the formula should not be considered because it is a

mutual company and needs no profit. In his opening statement to the Commission appellant's counsel said: "We think we are entitled to different treatment and to show that while it is justified, that 5% for profit, for a stock company, it should not be required for a mutual company if that company has demonstrated for a reasonable period of years, at least five, and in this case twenty, that it is not necessary."

No distinction between stock companies and mutual companies is to be found in the statutes providing for the regulation of fire insurance rates. As stated in *American Druggists*, 201 Va. at 278, Note 3, 110 S. E. 2d at 511, "All insurance companies, stock, mutual and others, doing business in this State, with exceptions not here pertinent," are made members of the Insurance Rating Bureau, Code § 38.1-227, which is required to file rate schedules on behalf of each and every member of the Bureau, § 38.1-232. The formula for making these rates in use since 1928 makes no distinction between stock and mutual companies. It has always included a factor of 5% in keeping with § 38.1-252 directing that due consideration be given "to a reasonable margin for underwriting profit and contingencies."

As the majority of the Commission stated in its opinion:

"In the making of insurance rates, uniform rates for all companies are based on the statistics applicable to all companies as a group. * * *

"* * * The manual rates apply equally to stock and mutual companies. There is not one manual rate for stock companies and a lower manual rate for mutual companies on the theory that mutual companies do not need to make profits. If a stock company makes a profit, the profit belongs to the stockholders (except so far as it is paid to participating policyholders), and if a mutual company makes a profit, the profit belongs to the policyholders. * * *."

The profit and contingency factor in the formula is not to prescribe what the net earnings of insurance companies shall be or by what name their net earnings may be called. Its office is to aid in providing a rate for writing fire insurance which will enable all companies to stay solvent. The stock company calls its net earnings "profits" and ordinarily pays out some of them to its stockholders. This mutual company calls its net earnings "surplus" and holds it for the benefit of its policyholders. In its by-laws it calls these earnings "profits" and authorizes its board of directors to determine what part of the profits shall be returned as dividends and what part credited to surplus, or to allocate any or all profits to general surplus to be used

for expansion of the business and for the protection and benefit of the policyholders.

We see no legal or logical reason for requiring favored treatment for a mutual company which may or may not hold its net earnings for use in the expansion of its business and for the benefit of its policyholders over a stock company which may or may not pay out its net earnings as dividends to its stockholders.

We conclude, as in *American Druggists*, that in refusing the deviation in the amount requested by the appellant the Commission did not exceed its constitutional or statutory powers or unreasonably exercise its authority. Its order is therefore

*Affirmed.*