## Richmond

Virginia State AFL-CIO v. Commonwealth of Virginia, Et Al.

Henry E. Howell, Jr., Et Al. v. Commonwealth of Virginia, Et Al.

April 28, 1969.

Record Nos. 6804 and 6805.

Present, All the Justices.

*George W. Shadoan* (Md.) (*Beecher E. Stallard*, on brief), for appellant in Record No. 6804.

*Henry E. Howell, Jr.; Stanley E. Sacks* (*Thomas W. Moss, Jr.; George E. Allen, Jr.; Clive L. DuVal, II; C. Harrison Mann, Jr.*, on brief), for appellants in Record No. 6805.

*M. Wallace Moncure, Jr.* (*Moncure & Cabell*, on brief), for appellees in Record Nos. 6804 and 6805.

GORDON, J., delivered the opinion of the court.

On February 10, 1967 the National Bureau of Casualty Underwriters (the "Bureau"), on behalf of about 145 stock insurance companies, filed an application with the State Corporation Commission for an increase in automobile liability insurance rates. The Bureau sought a 9.9% increase in premiums for private passenger automobile policies with limits of $15,000/$30,000 for bodily injury liability and $5,000 for property damage liability.

After holding public hearings, the Commission entered an order on June 23, 1967, rejecting the 9.9% increase requested by the Bureau, but approving an 8.2% increase. The interveners in the proceeding before the Commission appeal from that order.

An understanding of the issues raised on this appeal depends upon an understanding of certain terms and techniques used in the rate-making process.

For rate-making purposes, the components of a casualty insurance premium are the "pure premium" and "expense loading". The "pure premium" is the amount allocated for the settlement of casualty losses, including loss adjustment expenses. "Expense loading" is the amount allocated for operating expenses and for underwriting profit and contingencies.

The generally accepted method of computing the pure premium is the "incurred loss" method. The incurred losses for the pilot accident year (1965 in this case) are first determined by adding the payments actually made for losses during the year and the reserve for outstanding claims for losses during the year. The "pure premium" is then obtained by dividing the number of automobiles insured for the year into the incurred losses for the year, and by multiplying the resulting quotient by a "trend factor"—an adjustment for the recent upward or downward trend in claims costs.[1]

---

[1] Strictly speaking, the quotient referred to in the text is the "average pure premium", and the quotient as modified by the trend factor is the "rate level pure premium". The following table sets forth the substance of the Bureau's computation of the rate level pure premiums and the resulting rate increases:

| (1)<br>Coverage | (2)<br>Accident<br>Year | (3)<br>Earned<br>Number<br>of Cars | (4)<br>Incurred<br>Losses | (5)<br>Average<br>Pure<br>Premiums<br>(4) ÷ (3) |
|---|---|---|---|---|
| Bodily Injury | 1965 | 418,600 | $12,096,201 | $28.90 |
| Property Damage | 1965 | 418,600. | $ 5,878,795 | $14.04 |

"Expense loading", other than for profit and contingencies, is determined by reviewing the expense accounts of the insurance companies. Profit and contingencies are determined with reference to the Virginia statute, which contemplates "a reasonable margin for underwriting profit and contingencies". Va. Code Ann. § 38.1-252(3), (Supp. 1968).

According to the Bureau's application, the pure premium for bodily injury and property damage coverage should be $45.23, an increase of 9.9% over the existing rate. See n. 1, lines (8), (10), *supra*. The items of expense loading and the ratio of those items to total premium, as well as the ratio of pure premium to total premium, were set forth in the Bureau's application as:

| *Item* | *Provision* |
|---|---|
| General Administration | 5.5% |
| Inspection and Bureau | 1.2 |
| Total Production Cost Allowance | 20.0 |
| Taxes, Licenses and Fees | 3.7 |
| Underwriting Profit and Contingencies | 5.0 |
| Total Service and Overhead [expense loading] | 35.4 |
| Expected Loss and Loss Adjustment [pure premium] Ratio | 64.6 |
| Grand Total | 100.0[2] |

| | Bodily Injury | Property Damage | Combined |
|---|---|---|---|
| (6) Accident Year 1965-Average Pure Premiums [Col. (5)] | $ 28.90 | $ 14.04 | $ 42.94 |
| (7) Trend Factor | 1.000 | 1.163 | |
| (8) Rate Level Pure Premiums [(6) x (7)] | 28.90 | 16.33 | 45.23 |
| (9) Average Pure Premiums under Existing Rates | 27.38 | 13.78 | 41.16 |
| (10) Increase [(8) over (9)] | +5.6% | +18.5% | +9.9% |

[2] The pure premium being $45.23, this table produces a total premium of $70.02. The State Corporation Commission has observed that "officials charged with the duty of fixing automobile liability insurance rates have regularly predicted losses at least five percentage points lower than actual losses". *Investigation of Rates for Writing Automobile Liability Insurance on Private Passenger Automobiles*, 1967 State Corp. Comm'n Rep. 20, 25. But as pointed out in a report of consulting actuaries and insurance auditors (see n. 8, *infra*), it is not proper "knowingly to overprovide for an item of expense on the theory that this is needed to offset rate deficiencies arising from other factors such as underestimation of anticipated losses".

The percentages set forth in the table conformed to those previously approved by the State Corporation Commission.

The Commission accepted the Bureau's computation of the pure premium, but made changes in the expense loading that resulted in approval of an 8.2% rate increase, instead of the 9.9% increase requested by the Bureau.

Under the order appealed from, the Commission authorized General Administration expenses of 5% of total premium, instead of 5.5% as requested by the Bureau, because it found that the "companies' general overhead expenses do not increase at the same rate as the premium volume". Also, the Commission authorized Underwriting Profit and Contingencies of 4.5% of total premium, instead of 5% as requested by the Bureau, to compensate for the income derived from the investment of premiums collected but not yet earned —"unearned premiums".[3] As a result of the reductions made by the Commission, the expense loading ratio was reduced to 34.4% and the pure premium ratio was increased to 65.6%. The pure premium being $45.23, the total premium authorized by the Commission was $68.95. See n. 2, *supra.*

The interveners-appellants objected to the rate increase authorized by the Commission and to rulings made by the Commission during the course of the hearings. We will separately describe and dispose of the substantial issues raised by the interveners' assignments of error.

### I. Incurred Loss v. Paid Loss

The interveners contend that the Commission should have used the paid-loss method of determining pure premium, rather than the incurred-loss method described p. 777, *supra.* Under the paid-loss method, pure premium is determined on the basis of the ratio of losses paid during a given period to either premiums written or premiums accrued during that period.

In 1966 the Insurance Commissioner of Maryland approved the paid-loss method. *National Bureau of Casualty Underwriters' Proposed Revision of Automobile Liability Insurance Rates for Private Passenger Cars,* Jan. 7, 1966. That method has been adversely

---

[3] "[W]hat they [insurance companies] call 'Unearned Premiums' is the aggregate amount which a company at any designated time would have to refund to its policy holders were *it* at that time to cancel all its policies." *Aetna Insurance Co.,* 1929 State Corp. Comm'n Rep. 29, 57, *aff'd,* 160 Va. 698, 169 S.E. 859 (1933).

criticized, however, because it understates losses when insured automobiles, accidents and average claim costs are increasing.[4]

We hold that the expert evidence before the Commission in this proceeding justified its adoption of the incurred-loss method. *Insurance Dep't* v. *Johnson*, 211 Pa. Super. 138, 238 A. 2d 23 (1967).

## II. Expenses Specially Applicable to Virginia

The Virginia statute prescribes that in fixing rates the Commission shall give "due consideration . . . to past and prospective expenses both countrywide and *those specially applicable to this State . . .*". Va. Code Ann. § 38.1-252 (3) (Supp. 1968) (emphasis added).

While on the witness stand, the Bureau's expert was asked in effect whether the exhibits that had been introduced showed the general administration and acquisition expenses specially applicable to Virginia. He answered, "No, we do not have specific Virginia data". Subsequently, the interveners moved the Commission to require the Bureau to submit data reflecting Virginia *acquisition* expenses. With one Commissioner dissenting, the Commission overruled the motion on the ground that such data "would not be of any benefit to the Commission".

The Commission erred in overruling the interveners' motion. Code § 38.1-252(3) requires the production of data reflecting Virginia acquisition expenses. *See Nationwide Mut. Ins. Co.* v. *Williams*, 188 So. 2d 368, 372 (Fla. App. 1966). Without such data the Commission cannot know whether Virginia expenses are lower than the national average, necessitating a compensating adjustment in Virginia rates to prevent Virginia motorists from paying in part for policies written in other states.

---

[4] In their argument for adoption of the paid-loss method, the interveners urged that insurance companies should be at least required to account for expenses on an accrual basis so long as they account for premiums on an accrual basis. In this connection the interveners point out that although insurance companies accrue premiums, they charge off the agent's commission on the day a policy is written.

The Commission has apparently concluded that the charging off of agents' commissions on a cash basis is proper even though premium income is treated on an accrual basis. *Investigation of Rates for Writing Automobile Liability Insurance on Private Passenger Automobiles, supra* n. 2, at 27-28. But neither that opinion, nor the report of the actuaries and auditors engaged by the Commission, satisfactorily explains why such mixture of cash and accrual accounting conforms with genererally accepted accounting practices or, if not, why the accounting practices employed by the insurance companies are proper insofar as rate-making is concerned. On remand, the Commission should give further consideration to these questions.

## III. Investment Income

Premiums collected by insurance companies are credited to the "unearned premium reserve".[5] At the end of each month, an *aliquot* portion (1/12th of the total premium for 1 year) is transferred from the unearned premium reserve to the "earned premium account". From time to time, amounts estimated to be sufficient for the settlement of casualty losses are transferred from the earned premium account to the "loss reserve".[6] The companies derive income from investment of the amounts credited to the unearned premium reserve and the loss reserve.[7]

In fixing rates in this proceeding, the Commission considered income derived from investment of the unearned premium reserve; it reduced the margin for underwriting profit and contingencies from 5% to 4½% to compensate for such income. The Commission did not consider, however, any income derived from investment of the loss reserve. A crucial question on this appeal is whether the Commission *properly considered* income on the unearned premium reserve and *properly refused to consider* income on the loss reserve in determining the margin for underwriting profit and contingencies.

In *Aetna Ins. Co.* v. *Commonwealth*, 160 Va. 698, 169 S.E. 859 (1933), the Commission considered income derived from investment of the unearned premium and loss reserves in fixing fire insurance rates. The then controlling statute provided that the Commission should consider whether the rates in effect were "producing a profit in excess of what is reasonable". Va. Code Ann. § 4314(9) (Supp. 1928). We held that the Commission properly interpreted that statute as "a clear mandate to it to consider for purposes of rate regulation all actual profits produced by rates charged, regardless of whether they are included in the technical definition of 'underwriting profits' or not . . .". *Id.* at 723, 169 S.E. at 868.

In 1948 the Legislature adopted Code § 38.1-252, which controls this case. Clause (3) thereof provides: "Due consideration shall be given . . . to a reasonable margin for *underwriting* profit and contingencies". (Emphasis added.) Since "underwriting profit" is usually defined as "the sum arrived at by deducting from earned premiums all incurred losses and incurred expenses", *Bullion* v. *Aetna Ins. Co.*,

---

[5] Va. Code Ann. § 38.1-171 (1953 Repl. vol.).

[6] Va. Code Ann. § 38.1-173 (1953 Repl. vol.).

[7] Although reserves are not physically segregated funds, for convenience we will refer to investment of, and income on, the unearned premium reserve and loss reserve.

151 Ark. 519, 532, 237 S.W. 716, 720 (1922), that term excludes all investment income. *Insurance Dep't* v. *Philadelphia*, 196 Pa. Super. 221, 173 A.2d 811 (1961).

But even though the margin for underwriting profit and contingencies to be fixed by the Commission does not include investment income, it does not follow that in fixing rates the Commission should ignore investment income. Code § 38.1-252(3) directs the Commission to give due consideration to "all relevant factors within and without the State". And as the actuaries and auditors engaged by the Commission[8] pointed out:

> "It is inconceivable that regulatory authorities, in approving the 5-percent provision so defined [a 5% margin for profit and contingencies, excluding all investment income or all investment income except that on the unearned premium reserve], were unaware of the existence of additional income from investments or that such an important factor could not have influenced their judgment in approving it. Hence we can only infer that investment income is already considered in rate making and that any issue legitimately arising here concerns the manner in which consideration is given."

In fact, the Commission in this proceeding did consider the income derived from investment of the unearned premium reserve, which is part of the income derived from the investment of premium income. We agree that this was proper because income derived from investment of the unearned premium reserve is a "relevant factor" in fixing rates.[9] The remaining question is whether the Commission

[8] In 1966 the Commission engaged Woodward & Fondiller, Inc., consulting actuaries and insurance auditors, to conduct a study and advise the Commission. Following receipt of the report of the actuaries and auditors, the Commission held public hearings in September and December 1966. This investigatory proceeding was concluded by the rendering of the Commission's opinion on May 15, 1967. *Investigation of Rates for Writing Automobile Liability Insurance on Private Passenger Automobiles*, 1967 State Corp. Comm'n Rep. 20.

[9] The Commission apparently considered income derived from investment of the unearned premium reserve in a previous proceeding involving Code § 38.1-252. *Harford Mut. Ins. Co.* v. *Commonwealth*, 201 Va. 491, 112 S.E. 2d 142 (1960). A federal court concluded, however, that no investment income should be considered in rate making "because the premium when paid is the property of the company". *Aetna Ins. Co.* v. *Hyde*, 34 F.2d 185, 198 (W.D. Mo. 1929), *aff'd on other grounds sub nom. National Fire Ins. Co.* v. *Thompson*, 281 U.S. 331, 50 S. Ct. 288, 74 L.ed. 881 (1930). But, as pointed out by the Missouri court, the fact that collected premiums belong to the company is beside the point:

should have considered income derived from investment of the loss reserve.

Respecting income on the loss reserve, the Commission stated in an opinion rendered May 15, 1967 in an investigatory proceeding (see n. 8, *supra*):

> "When a company commences business its paid-in surplus is available to pay initial losses. It must at all times have assets sufficient to meet its obligations. If its obligations are so great that its loss reserve is too small, it will have to issue more stock or go out of business. *Nothing ever goes into the loss reserve except assets contributed by the stockholders to the company.* No part of an unearned premium goes into the loss reserve:—it stays in the unearned premium reserve. *The earned part of a premium has been earned and is added to earned surplus.* The policyholders are no more entitled to share in the earnings from the investment of the loss reserve than they are to share in the earnings derived from the investment of the original capital and paid-in surplus. The loss reserve is simply an item on the liability side of the ledger that diminishes the company's net worth. * * * The policyholders have no legal or equitable interest in the company's capital, its capital surplus or its earned surplus, the three items that make up its net worth."

---

"It is . . . argued that we cannot count the interest on the unearned premium as underwriting profit, because that, in effect, would be compelling the insurer to pay interest on its own money to the insured. The argument thus assumes that no funds owned by the insurer, no matter how acquired or how used, can earn a profit which can be attributed to the insurance business, and that the policy holder must own the money used in the insurance business before the earnings of it can be called underwriting earnings.

"We are not taking an account between the insurance company and the policy holder; we are trying to find out how much the insurer profits by its insurance business.

"The insured pays his premium, and has no further claim on that specific money, but he holds a contract which the insurer must perform, and if it holds that unearned premium for the purpose of securing performance, is it not *used* in the underwriting business?" *Aetna Ins. Co.* v. *Hyde*, 315 Mo. 113, 140, 285 S.W. 65, 74 (1926), *cert. dismissed*, 275 U.S. 440, 48 S.Ct. 174, 72 L.ed. 357 (1928).

At the opposite pole from the federal *Hyde* is *Aetna Ins. Co.* v. *Travis*, 124 Kan. 350, 259 P. 1068 (1927), *cert. denied sub nom. Aetna Ins. Co.* v. *Baker*, 276 U.S. 628, 48 S. Ct. 321, 72 L.ed. 740 (1928), *amend. of judgment denied*, 130 Kan. 2, 285 P. 522 (1930) (per curiam). The court in *Travis* held not only that *all* investment income should be considered in fixing rates, but also that rates should be so fixed as to yield only a reasonable return on invested capital.

*Investigation of Rates for Writing Automobile Liability Insurance on Private Passenger Automobiles,* 1967 State Corp. Comm'n Rep. 20, 29 (emphasis added).

The fallacy in the Commission's conclusion about loss reserves stems from these statements: "Nothing ever goes into the loss reserve except assets contributed by the stockholders to the company. * * * The earned part of a premium has been earned and is added to earned surplus."

A premium is designed to pay casualty losses and to provide for operating expenses and underwriting profit. Contrary to the Commission's view, premium income does not become stockholders' profit by the mere passage of time, without any charge for the payment of casualty losses. Nor is the loss reserve derived from funds belonging to the stockholders. The loss reserve represents the part of the premiums paid by the policyholders that, it is expected, will be devoted to the payment of losses. So premiums paid by policyholders, rather than assets contributed by stockholders, "go into" the loss reserve.[10]

When an amount representing part of a premium is transferred from the unearned premium reserve to the earned premium account, such amount has been "earned" only in the sense that it would not be refunded to the policyholders if the insurance company should cancel all its policies. See n. 3, *supra.* But that amount of the premium has *not* been "earned" in the sense of becoming part of earned surplus—the major portion of that amount is transferred to the loss reserve, and only a minor portion will foreseeably become part of earned surplus. The Commission confused "earned premiums" with "earnings".

Moreover, the Commission's differentiation between income on the unearned premium reserve and income on the loss reserve does not accord with *Aetna Ins. Co.* v. *Commonwealth, supra.* In that case, we held that income derived from the investment of the loss reserve, as well as the unearned premium reserve, should be considered in fixing rates for fire insurance coverage:

" 'It would appear to be just as reasonable in computing profit made from the purchase and sale of a flock of sheep to omit from

---

[10] It would be necessary, of course, to transfer stockholders' funds to the loss reserve if the premiums collected should be inadequate to fund the loss reserve. But this would happen only if the existing rates were inadequate to provide for losses and expenses.

the computation the income received from the wool clip and the natural increase at the lambing season, as to discard in the computation of profits produced by rates the increase in income due to the investment of that portion of the premiums held in hand to meet existing but future payable liabilities [the loss reserve].' "

160 Va. at 721, 169 S.E. at 867.[11]

Counsel for the Bureau urges, however, that the rationale of the *Aetna* case, which involved fire insurance rates, is not applicable to investment income of automobile liability insurers. It is true that a different method is used to compute the pure premium for fire insurance rates from the method used to compute the pure premium for automobile liability insurance rates. The methods differ because of the relatively short time-lag between the date of a fire loss and the date of settlement, and the relatively long time-lag between the date of an automobile casualty and the date of settlement.[12] But that difference does not distinguish the *Aetna* case or make its rationale inapplicable here. The difference means only that the automobile insurer has the use of the loss reserve for a longer period than does the fire insurer.

We therefore hold that the Commission should consider income from investment of the loss reserve, as well as from investment of the unearned premium reserve, as a "relevant factor" in fixing a "reasonable margin for underwriting profit and contingencies". On remand of this case, the Commission should admit evidence respecting such investment income and, in the light of such evidence and of the evidence relating to the other factors to be considered by the Commission, authorize rates that will provide a reasonable margin for underwriting profit and contingencies.[13]

---

[11] To the same effect is *Aetna Ins. Co.* v. *Hyde*, 315 Mo. 113, 285 S.W. 65 (1926), *cert. dismissed*, 275 U.S. 440, 48 S.Ct. 174, 72 L.ed. 357 (1928). Rejecting the insurance companies' argument that earned premiums represent earnings or stockholders' funds, the court said: "Taking all respondents' [the insurance companies'] arguments on the subject, the ultimate logical conclusion is this: There never can be any underwriting profits. For, no premium can be counted as profits before they are earned; after they are earned they go into the investment surplus and cannot be counted as underwriting profits." *Id.* at 141, 285 S.W. at 75.

[12] In fire insurance rate-making, incurred losses for a given year are generally considered to be the sum of payments made during that year for losses happening during the year, plus or minus the net change in loss reserves between the beginning and the end of the year. The generally accepted method of determining incurred losses for automobile insurance rate-making purposes is set forth *supra*, p. 777.

[13] The actuaries and the auditors engaged by the Commission suggest that a 5%

The order of the Commission entered June 23, 1967 is reversed, insofar as it approves insurances rates, and the case is remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

---

profit and contingency margin, less a margin representing income from investment of the unearned premium and loss reserves, will not be adequate to attract investment capital. We intimate no opinion in this respect because under Code § 38.1-252 the Commission is charged with the responsibility of fixing a "reasonable margin for underwriting profit and contingencies".