IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 14, 2010 Session

# TENNESSEE INDEPENDENT COLLEGES AND UNIVERSITIES ASSOCIATION BENEFIT CONSORTIUM, INC. v. TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE, ET AL.

### Appeal from the Tennessee Claims Commission
### No. 2007-0010-103    Stephanie Reevers, Commissioner

_____

### No. M2010-00629-COA-R3-CV - Filed December 21, 2010

_____

In this appeal from the Tennessee Claims Commission, taxpayer, a self-funded multiple employer welfare arrangement, seeks a refund of taxes paid under protest, asserting that the tax was preempted by the Employee Retirement Income Security Act and that the tax is uncertain and ambiguous. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J. and DAVID H. WELLES, SP. J., joined.

H. Rowan Leathers and Jeffrey Zager, Nashville, Tennessee, for the appellant, Tennessee Independent Colleges and Universities Association Benefit Consortium, Inc.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Laura T. Kidwell, and Sarah A. Hiestand, Senior Counsels, Financial Division, for the appellee, State of Tennessee.

### OPINION[1]

The Tennessee Independent Colleges and Universities Association Benefit Consortium, Inc., ("TBC") is a Tennessee not-for-profit corporation; the members of TBC are all members of the Tennessee Independent Colleges and Universities Association ("TICUA"). One function of TBC is to spread the expense and risk of health care coverage

_____

[1] The factual summary is derived from the parties' statements of undisputed material facts.

for covered employees of members to other members. To accomplish this purpose TBC maintains a health and welfare plan providing certain benefits to participants, their dependents and beneficiaries.

TBC has met the requirements for pooling its liabilities for the purpose of qualifying as a self-insurer under Tenn. Code Ann. § 56-26-204. Pursuant to Tenn. Code Ann. § 56-26-204(c) the pool is subject to the tax on gross premiums at Tenn. Code Ann. § 56-4-205. TBC also qualifies as a "multiple employer welfare arrangement" ("MEWA") as defined by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*[2] and as adopted at Tenn. R. 0780-1-76-.02(5). The plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1),[3] and is not fully insured as contemplated by 29 U.S.C. § 1144(b)(6)(D). Under TBC's bylaws, it receives "contributions" from its members and participants to fund benefits, administrative expenses, and taxes.

TBC filed Statements of Premiums and Fees for Taxation, Life, and Accident, and Health Companies with the Tennessee Department of Commerce and Insurance for annual and certain quarterly periods for the years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008 and was assessed the taxes specified at Tenn. Code Ann. § 56-4-205; it paid the taxes under protest.[4] TBC thereafter filed a complaint with the Tennessee Claims Commission against the Commissioner of the Department of Commerce and Insurance seeking a refund of taxes paid. Following discovery, the parties each filed a motion for summary judgment,

---

[2] ERISA sets minimum standards for most voluntarily established pension and health plans in private industry and provides protection for individuals in these plans.

[3] 29 U.S.C. § 1002(1) states:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

[4] The tax is referred to by the parties as the "MEWA Tax," even though the tax imposed was a tax applicable to insurance companies as defined at § 56-4-201. In this opinion we shall maintain the reference to the MEWA tax.

relying on statements of undisputed material facts, depositions and other discovery materials. The Commission granted the Department's motion.[5]

TBC appeals, asserting that the imposition of the tax against TBC and the payments made were not proper because the tax, as applied to TBC, was preempted by ERISA; that application of the tax was "uncertain and ambiguous" because it attempts to impose a tax on an "undefined tax base" and at an "unspecified rate;" and that certain contributions from its members, as defined in its bylaws, do not fall within the meaning of "gross premiums" within the meaning of Tenn. Code Ann. § 56-4-205.

## I. Standard of Review

This case was resolved below on cross motions for summary judgment. Summary judgment is appropriate where there are no genuine issues of material fact and where one or more of the parties is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). Since our review concerns questions of law, we review the record *de novo* with no presumption of correctness. *See* Tenn. R. App. P. 13(d); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).

## II. Discussion

### A. *ERISA Preemption*

Under the Supremacy Clause of the United States Constitution, federal law "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. Federal law may preempt state law in one of three ways: 1) expressly, 2) by implication, or 3) by a direct conflict between federal and state law. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). We do not assume that preemption applies, and in most cases we begin with the presumption that Congress did not intend to derogate state regulation. *Id.* Insurance is well established as an industry subject to regulation and control by the states through the exercise of their police powers, and Congress has given state legislatures broad powers to regulate the insurance industry. LEE R. RUSS & THOMAS F.

---

[5] In its original complaint, TBC sought refund of all payments made after July 26, 2004. The Claims Commission determined that TBC's claims for payments made between July 26, 2004 and March 2, 2006, were untimely and granted a motion to dismiss those claims; that decision has not been appealed. At issue are tax payments, late filing penalties, and interest payments made by TBC from May 31, 2006 to January 15, 2009.

SEGALLA, 1 COUCH ON INS. § 2:1–2 (3d ed. 2010).  "Where . . . the field that Congress is said to have pre-empted has been traditionally occupied by the States 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (citations omitted)).  When asserting that ERISA preempts the state statute in question, TBC "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'"  *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 (1997) (citing *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)).  To determine whether ERISA preempts the state law in question, "as in any pre-emption analysis, 'the purpose of Congress is the ultimate touchstone.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747 (1985) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)).  Accordingly, we begin our inquiry by first examining the text of ERISA.  *See Travelers*, 514 U.S. at 655.

ERISA was enacted "to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries"; it requires disclosures and reporting of certain financial and other information; establishes standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans; and provides for appropriate remedies and sanctions.  29 U.S.C. § 1001(b).  ERISA contains a broad preemption provision, by which ERISA "supersede[s] any and all state laws insofar as they may now or hereafter relate to any benefit plan . . . ."  29 U.S.C. § 1144(a).  Two other provisions, known as the "savings clause" and the "deemer clause," further define the extent of preemption under ERISA:

> (A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

> (B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

29 U.S.C. § 1144(b)(2).

Thus, prior to 1983, while the savings clause preserved the states' right to regulate the business of insurance and persons engaged in that business, the deemer clause prevented state regulation of employee benefit plans by declaring that such plans were neither insurers nor engaged in the business of insurance for purposes of state insurance laws. In 1983, however, Congress amended ERISA to include a provision that would enable states to regulate MEWAs while avoiding preemption. Pub. L. No. 97-473 (97th Cong., 2nd Sess.) (1983). The amendment was codified at 29 U.S.C. § 1144(b)(6) (referred to herein as the "MEWA clause"). Of import to the instant appeal, the MEWA clause states that where a MEWA is not fully insured "any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter." 29 U.S.C. § 1144(b)(6)(A)(ii). The reason for the amendment was explained by the 10th Circuit Court of Appeals in *Fuller v. Norton*:

> The impetus behind the amendment was an interest in curbing abuses by multiple employer trusts, which would claim ERISA preemption when states attempted to regulate them as quasi-insurance companies. After thwarting state regulation, some of these uninsured trusts declared bankruptcy, leaving employees responsible for millions of dollars in unpaid hospital and medical bills. The purpose of the amendment was to make clear the extent to which state law is preempted with respect to employee benefit plans that are also MEWAs. The result, as the Conference Report notes, is that "[i]n the case of a multiple employer welfare arrangement that is not fully insured, the provision exempts from ERISA preemption any state laws that regulate insurance. . . ."

*Fuller v. Norton*, 86 F.3d 1016, 1023–24 (10th Cir. 1996) (internal citations omitted). The court in *Fuller* concluded that the legislative history of the amendment, in addition to the language and structure of the MEWA clause itself, authorizes states to regulate MEWAs as insurance companies.[6] We agree that the State of Tennessee in the appropriate circumstance may regulate a MEWA so long as the law or regulation (1) regulates insurance and (2) is not inconsistent with ERISA. The question before us, then, is whether Tenn. Code Ann. § 56-26-204 "regulates insurance" such that it is not pre-empted by ERISA.[7]

---

[6] At least one other circuit has held the same. *See Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 5 (2d Cir. 1993), cert. denied, 510 U.S. 1043 (1994).

[7] TBC does not contend that Tenn. Code Ann. 56-26-204 is inconsistent with ERISA within the meaning of 29 U.S.C. § 1144(b)(6)(A)(ii).

In *Kentucky Assoc. of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003), the Supreme Court established a two prong test to determine whether a state law regulates insurance pursuant to 29 U.S.C. § 1144(b)(6)(A)(ii). In order for a law to regulate insurance, *Miller* held that it 1) must be specifically directed toward entities engaged in insurance, and 2) must substantially affect the risk pooling arrangement between the insurer and the insured. *Miller*, 538 U.S. at 341–42. TBC concedes that Tenn. Code Ann. § 56-26-204 is specifically directed toward entities engaged in insurance but asserts that the statute does not meet the second prong of the *Miller* test—that it does not substantially affect the risk pooling arrangement between the insurer and insured.

As an initial matter, TBC urges this Court, in determining whether ERISA preempts the MEWA tax, to analyze the tax as a discrete item, separate and apart from the statutory scheme in which it is imposed. Construed in this manner, TBC argues that the MEWA tax does not regulate insurance and, consequently, is preempted by ERISA. We decline, however, to apply this proposed analytical framework. Our objective when construing a statute is to effectuate the purposes of the General Assembly. *Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000). Insofar as possible, the intent of the General Assembly should be determined by the natural and ordinary meaning of the words used in the statute, and not by a construction that is forced or which limits or extends the meaning. *Id*. We must construe statutes in their entirety, neither constricting nor expanding the General Assembly's intent. In so doing, we assume that the General Assembly chose the words of the statute purposely, and that the words chosen "convey some intent and have a meaning and a purpose" when considered within the context of the entire statute. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004) (citations omitted). Consequently, we examine the statutory scheme and the intent of the Legislature in enacting it.

Tenn. Code Ann. § 56-26-204 was enacted by Chapter 681 of the Public Acts of 2000. The caption of the Act reads: "AN ACT to amend Tennessee Code Annotated, Title 56, Chapter 26, to allow trade and professional associations to pool their liabilities for accident and sickness insurance." 2000 Tenn. Pub. Act 681.[8] The Act included the provisions in current subsection (a) permitting trade or professional associations to pool their liabilities to qualify as self-insurers[9]; in subsection (b) granting authority to the Commissioner of Commerce and Insurance to promulgate rules and regulations "as deemed necessary to provide for the solvency, administration, examination, and enforcement of such pooling

---

[8]     The Acts and Resolutions of the 101st General Assembly can be found at http://state.tn.us/sos/acts/101/index.htm.

[9]  Tenn. Code Ann. § 56-26-204(a)(1).

agreements"[10]; and in subsection (c), which subjected the pools "to taxation under chapter 4 of this title, filing and approval under this chapter, and laws for protection of policyholders under chapter 7 of this title."[11]   Pursuant to the powers granted in § 56-26-204(b), the Commissioner promulgated regulations applicable to self-insuring associations and non-profit business coalitions for health, located at Tenn. Comp. R. & Regs. 0780-1-76.

Tenn. Code Ann. § 56-26-204 authorizes the formation of employer self-insurer arrangements and enables members of the same trade or professional organization to qualify as self-insurers and pool their liabilities for accident and sickness insurance.  By permitting the establishment of pooling arrangements, the law enables qualifying employers to create associations that spread the expense and risk of health care coverage between the association members. The Executive Director of TBC, Gregg Conroy, testified by deposition that TBC was able to control costs by leveraging its size for purchasing power and that some of its members were able to obtain insurance policies for health benefits at a lower cost than could be had individually.  *Miller* explained when a state law "alters the scope of permissible bargains between insurers and insureds," it can be held to substantially affect the risk pooling arrangement between the insurer and the insured, thereby meeting the second prong of the test.  *Miller*, 538 U.S. at 339–39.  Tenn. Code Ann. § 56-26-204 enables employers to form organizations such as TBC that can substantially alter the available health care and insurance coverage for employees across the state and gives the Commissioner of Commerce and Insurance authority to regulate such organizations; the statute and regulations regulate insurance and satisfy the requirements of *Miller* and 29 U.S.C. § 1144(b)(6).  Accordingly, the tax is not preempted by ERISA.

### B.  *Certainty of the MEWA Tax*

TBC contends that the Commission erred in holding that what TBC characterizes as the "MEWA tax provision of T.C.A. § 56-26-204(c)" is sufficiently certain and unambiguous when applied to its plan; according to TBC, uncertainty and ambiguity is created by the fact that TBC is assessed the premium tax at  § 56-4-205 despite the fact that it is a self-insured MEWA and does not charge premiums to its members.  Thus, TBC urges this court to analyze § 56-26-204(c) as a taxing statute.  TBC also contends that "the MEWA tax attempts to impose a tax . . . at an unspecified rate."

Tenn. Code Ann. § 56-26-204(c) states that "[p]ools created under this section shall be subject to taxation under chapter 4 of this title, filing and approval under this chapter, and

---

[10]  Tenn. Code Ann. § 56-26-204(b).

[11]  Tenn. Code Ann. § 56-26-204(c).

laws for protection of policyholders under chapter 7 of this title." Pursuant to the powers granted in § 56-26-204(b), the Commissioner identified Tenn. Code Ann. § 56-4-205 as the applicable tax statute for such pooling arrangements at Tenn. Comp. R. & Regs. 0780-1-76.-13.[12] Thus, our analysis focuses on Tenn. Code Ann. § 56-4-205.

In our analysis, we acknowledge the rule of *Saturn Corp. v. Johnson,* 197 S.W.3d 273 (Tenn. Ct. App. 2006) that taxing statutes must be construed strictly against the taxing authority and in favor of the taxpayer. We also give effect to the "plain import of the language of the act" and must not use the strict construction rule to thwart "the legislative intent to tax." *International Harvester Co. v. Carr*, 466 S.W.2d 207, 214 (Tenn. 1971); *see also Bergeda v. State*, 167 S.W.2d 338, 340 (Tenn. 1943).

Tenn. Code Ann. §§ 56-26-204(c) and -4-205, read together, identify pooling arrangements as the applicable base for assessing the tax and set the amount of the tax. In light of the clear legislative directive to tax such plans under chapter 4, the fact that § 56-4-205 does not specifically mention MEWAs is irrelevant.

TBC does not fully develop its argument that the tax is imposed at an unspecified rate. We do not find any ambiguity or uncertainty with respect to the rate of the tax. Tenn. Comp. R. & Regs. 0780-1-76.-13 imposes the tax at Tenn. Code Ann. § 56-4-205 on MEWAs such as TBC at the same rate as that imposed on accident and health insurers, which are subject to taxation under § 56-4-201. Tenn. Code Ann. § 56-4-205 states in part pertinent to this appeal the following:

> All insurance companies writing the forms of insurance enumerated in § 56-4-201, except life insurance companies and fraternal benefit associations, orders or societies, and except insurance companies and self-insurers covered by §§ 56-4-206 and 56-4-207, shall pay two and one half percent (2.5%) on gross premiums paid by or for policyholders residing in this state or on property located in this state. Domestic and foreign life insurance companies shall pay a tax equal to one and three fourths percent (1.75%) of gross premiums received from citizens of and residents of this state.

The rate of taxation is clear in the statute.

---

[12] Tenn. Comp. R. & Regs. 0780-1-76.-13 states: "The tax imposed on a self-funded qualified multiple employer welfare arrangement shall be the same amount imposed upon accident and health insurers under Tenn. Code Ann. § 56-4-205."

*C. Application of the tax to contributions of TBC members*

TBC further argues that Tenn. Code Ann. § 56-4-205, which levies a tax on "gross premiums," does not apply to the "contributions" paid by its members. TBC asserts that the contributions are, by their very nature, not premiums.

The Commissioner's response to TBC's concise statement of undisputed material facts includes the following:

6. The TBC funds the costs and expenses necessary or incident to the administration and handling of its affairs through contributions from its members. In this regard, the TBC's Bylaws provide as follows:

All costs and expenses necessary or incident to the administration and handling of the TICUA Benefit Consortium's affairs shall, unless otherwise agreed by the Members, be shared by the Members on a prorate basis using the number of each Member's covered employees for each level of coverage as the basis for such proration. Each Member shall be required to make contributions from time to time in such amounts as determined by the Board of Directors. Such contributions shall be in amounts sufficient to pay such Member's prorate share of costs associated with the Plan, all liabilities of the TICUA Benefit Consortium that are unpaid, as well as premiums paid to insurers as determined by the Board of Directors, utilizing the contribution requirements as [set] forth above.

(Conroy Depo., Ex 10, p. TBC-PT 000 13).

**RESPONSE**: Undisputed, with inclusion of the first sentence which is also material and undisputed that: "Determination of Contributions. Premium rates for each benefit provided through the TICUA Benefit Consortium will be determined annually for the TICUA Benefit Consortium by the Board of Directors.". . .

While the term "premium" is not otherwise defined in Chapter 4 of Title 56,[13] there is considerable agreement that an insurance premium is defined as the consideration paid an insurer for a contract of insurance. *Fourth & First Bank & Trust Co. v. Fidelity & Deposit Co. of Maryland*, 281 S.W. 785 (Tenn. 1926); *see also* 44 AM. JUR. 2d *Insurance* § 819 (2010); *American Family Mut. Ins. Co. v. Jones*, 739 F.2d 1259, 1262 (7th Cir. 1984); *Amos v. State*, 711 So. 2d 1197, 1199 (Fla. Dist. Ct. App. 2d Dist. 1998), review dismissed, 727 So. 2d 911 (Fla. 1998); *Fidelity Sec. Life Ins. Co. v. Director of Revenue*, 32 S.W.3d 527 (Mo. 2000); *Martin v. New York Life Ins. Co.*, 234 P. 673 (N.M. 1923); *Smith v. Sanft*, 181 A.2d 685 (Pa. Super. Ct. 1962); *Presentation Sisters, Inc. v. Mutual Ben. Life Ins. Co.*, 189 N.W.2d 452 (S.D. 1971); *Virginia State AFL-CIO v. Com.*, 167 S.E.2d 322 (Va. 1969); *Nationwide Mut. Ins. Co. v. Smith*, 172 S.E.2d 708 (W. Va. 1970). Black's Law Dictionary defines a "premium" as "[t]he periodic payment required to keep an insurance policy in effect." BLACK'S LAW DICTIONARY 1219 (8th ed. 2004).

In order to remain a member of TBC and receive the benefits of the pooling arrangement, members paid a prorated share of the costs to operate TBC and to fund expenses otherwise associated with its plan, based on the number of covered employees and level of coverage. The contributions paid to TBC by its members clearly constituted consideration for the coverage received and were premiums in all but name; accordingly, they were properly subject to the tax at Tenn. Code Ann. § 56-4-205.

## III. Conclusion

For the reasons set forth above, the decision of the Tennessee Claims Commission is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE

---

[13] Tenn. Code Ann. § 56-4-204 defines "gross premiums" as:

> . . . maximum gross premiums as provided in the policy contracts, new and renewal, including policy or membership fees, whether paid in part or in whole by cash, automatic premium loans, dividends applied in any manner whatsoever, and without deduction or exclusion of dividends in any manner; but excluding premiums returned on cancelled policies, or on account of reduction in rates, or reductions in the amount insured or experience rating refunds on life insurance policies and disability insurance policies.